PEBBLE BEACH COMPANY, Resorts of Pinehurst, Inc., and Sea Pines Company, Inc., Plaintiffs,

v.

TOUR 18 I, LTD., Defendant.

Civil Action No. 93–3875.

United States District Court, S.D. Texas, Houston Division.

Sept. 10, 1996.

Amended Order and Final Judgment Nov. 6, 1996.

---

Stephen M. Trattner, Jennifer B. Lucas, Lewis & Trattner, Washington, DC, James B. Gambrell, Akin, Gump, Strauss, Hauer & Feld, Austin, TX, William H. Knull, III, Mayer, Brown & Platt, Houston, TX, for Plaintiffs.

William Donald Durkee, Charles H. De La Garza, J. Mike Amerson, William D. Raman, John C. Cain, Arnold White & Durkee, Houston, TX, for Defendant Tour 18 I, Ltd.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HITTNER, District Judge.

Plaintiffs Pebble Beach Company ("Pebble Beach"), Resorts of Pinehurst, Inc. ("Resorts"), and Sea Pines Company, Inc. ("Sea Pines"), brought suit against Tour 18 I, Ltd. ("Tour 18"), which operates a public golf course in Humble, Texas named "Tour 18." Plaintiffs allege that Tour 18's replication of their golf hole designs and use of their service marks in advertisements, promotional materials, and on its golf course signs, violate various provisions of federal and state law.

Plaintiffs filed their complaint asserting causes of action under the Lanham Act, 15 U.S.C. § 1051 et. seq., for service mark and trade dress infringement, unfair competition, and false advertising. Plaintiffs also allege claims under Texas law for common law unfair competition, conversion, civil conspiracy, and service mark and trade dress dilution under the Texas anti-dilution statute, Tex. Bus. & Com.Code Ann. § 16.29. Pebble Beach asserts a claim for copyright infringement.

Defendant Tour 18 asserts counterclaims against plaintiffs under Texas common law for unfair competition, interference with existing and prospective business relations, and civil conspiracy. All of Tour 18's counterclaims arise out of plaintiffs' actions in prosecuting this lawsuit. Specifically, Tour 18 claims that this lawsuit is frivolous and intended only to put Tour 18 out of business.

This case was tried to the Court beginning on October 31, 1995, with final post-trial submissions filed by the parties on January 11, 1996. After reviewing the evidence, the submissions of the parties, and the applicable law, the Court enters the following findings of fact and conclusions of law.

## BACKGROUND FACTS

I. The Parties

Pebble Beach is a California general partnership with its principal place of business in Pebble Beach, California. Pebble Beach

owns and operates a golf and vacation resort in northern California, which includes five golf courses: (1) Pebble Beach Golf Links; (2) The Links at Spanish Bay; (3) Spyglass Hill; (4) Peter Hay Golf Course; (5) Old Del Monte Golf Course.

Resorts is a North Carolina corporation with its principal place of business in Pinehurst, North Carolina. Resorts owns and operates a golf resort in North Carolina that includes seven golf courses, numbered 1 through 7. Resorts is owned by Club Corporation of America, a company which owns and manages golf courses and clubs nationwide.

Sea Pines is a South Carolina corporation with its principal place of business on Hilton Head Island, South Carolina. Sea Pines owns and operates Harbour Town Golf Links as part of its golf and tennis resort on Hilton Head Island.

Tour 18 is a Texas limited partnership with its principal place of business in Humble, Texas. The partnership has merged into Tour 18, Inc., a Texas corporation. Tour 18 owns and operates a golf course in Humble, Texas (near Houston) and a golf course in Flower Mound, Texas (near Dallas). Tour 18's golf courses consist of golf holes that are copies of golf holes from famous golf courses around the United States. For its Humble, Texas course Tour 18 replicated three holes from plaintiffs' golf courses: Pebble Beach Hole 14, Pinehurst No. 2 Hole 3, and Harbour Town Hole 18. Additionally, Tour 18 replicated Harbour Town Hole 18 for its Flower Mound, Texas course.

## II. The Parties' Facilities and Operations

### A. Pebble Beach

Pebble Beach originated in 1881 when Pebble Beach Company's predecessor-in-in-

terest, the Pacific Improvement Company, purchased approximately 5,300 acres within the Del Monte Forest near Carmel Bay in California, in an area named "Rancho El Pescadero." The Pacific Improvement Company named an unincorporated portion of this area "Pebble Beach" in 1909. That area remains unincorporated within what is still referred to by the State of California as "Rancho El Pescadero." Pebble Beach Company controls access into this area by several security gates and charges a fee for admission. Pebble Beach Company also controls commercial activities within the Del Monte Forest area.

One of Pebble Beach's former principals, Samuel Morse, dedicated a large portion of the Del Monte Forest to a trust to preserve its natural state. In addition, he selected land adjacent to the Pacific Ocean for a golf course, which he named Pebble Beach Golf Links. The golf course opened in 1919 and has since been continuously referred to as "Pebble Beach." Pebble Beach Golf Links has consistently been named among the top five golf courses in the United States.[1] Furthermore, the evidence establishes that Pebble Beach Golf Links is a famous golf course among golfers nationwide. The fame of the course is based on a number of factors. First, its location on the shores of the Pacific Ocean give it a natural beauty that may be unsurpassed by any other golf course. Second, Pebble Beach Golf Links has hosted many nationally televised professional golf tournaments.[2] Additionally, many unsolicited articles written in books, magazines, and newspapers, and numerous statements of praise by distinguished golf writers and professional golfers, have added to Pebble Beach's reputation.[3]

---

**1.** In 1991, when Tour 18 chose to include Pebble Beach Hole 14 in its collection of "America's Greatest Eighteen Holes", *Golf Digest* magazine ranked Pebble Beach Golf Links as the fifth best course in the United States among a total of approximately 13,000 regulation eighteen hole golf courses. (PX 8; PX 22).

**2.** Some of the noteworthy golf events that have contributed to the fame of Pebble Beach Golf Links include three U.S. Amateur Championships, two U.S. Women's Amateur Champion-

ships, one Professional Golf Association ("PGA") Championship, three U.S. Open Championships, the annual Bing Crosby Pro–Am (also known as the "Crosby Clam Bake") that was held there for over thirty years, and the annual AT & T Pebble Beach National Pro–Am.

**3.** As George Peper, editor of *Golf* magazine, stated, "Pebble Beach is the greatest golf course in the world.... Don't even try to convince me otherwise–no place on the planet can touch Pebble Beach." (PX 302). Golf essayist Herbert

To promote its golf course and resort, Pebble Beach Company advertises Pebble Beach nationally, including in Texas. Golfers from Texas, including some from the Houston area, constitute approximately five percent of Pebble Beach's customers. Furthermore, while Pebble Beach is a public golf resort, the combination of Pebble Beach's history, beauty, and fame makes Pebble Beach an exclusive luxury golf resort to which people from around the world travel for vacations. Green fees[4] at Pebble Beach Golf Links are approximately $245.00 for golfers not staying overnight at the Lodge at Pebble Beach. For guests of the Lodge, green fees are approximately $195.00. The Lodge at Pebble Beach costs at least $280.00 per night.

Tour 18 replicated Pebble Beach Hole 14 for one of its golf holes at its Humble, Texas golf course and uses the phrase PEBBLE BEACH in its advertising, promotional brochures, and on its golf course signs. Pebble Beach Hole 14 is a par five, dog-leg right that is ranked as Pebble Beach's number one handicap hole, identifying it as the most difficult hole on the course. The 14th Hole is not adjacent to the Pacific Ocean, but it provides golfers with a view of the ocean from the tee box and while walking from the tee box to the green. Its fairway is lined with tall cypress and oak trees. One of the most notable features of Hole 14 is the large sand bunker guarding the left side of the green. In one of its brochures, Tour 18 touts this bunker as "one of the most critical bunkers in golf."

While the evidence shows that Pebble Beach Golf Links is a famous golf course, the evidence is insufficient to demonstrate that the design of the 14th Hole at Pebble Beach is famous among golfers. The 14th Hole is not Pebble Beach's "signature" hole and it has not been emphasized by Pebble Beach in its advertising and promotional brochures.[5] The evidence also indicates that the 18th and 7th Holes at Pebble Beach are more often photographed and emphasized in golf publications and literature because of their beauty and proximity to the rocky cliffs overlooking the Pacific Ocean.

Pebble Beach owns an incontestable[6] federal service mark registration of the phrase PEBBLE BEACH for golfing services, Reg. No. 1,065,027. Pebble Beach does not have a federal trademark registration for the design of Pebble Beach Hole 14. Pebble Beach also does not have a copyright, design patent, or utility patent on the design of Hole 14.

### B. Pinehurst No. 2

On a parcel of land in an unincorporated area of North Carolina, Resorts' founder, James Walker Tufts, built four golf courses and a resort hotel that he initially called Tuftstown, and later in 1895, renamed Pinehurst. Pinehurst remained an unincorporated area until 1980, when it was incorporated as the "Village of Pinehurst." Resorts now owns six and operates seven golf courses on the land acquired by Mr. Tufts. Tour 18 replicated Pinehurst No. 2 Hole 3 for its Humble, Texas course, and uses the phrase PINEHURST in its advertising, promotional brochures, and on its golf course signs.

Donald Ross was the architect of the Pinehurst No. 2 course. Many golfers and golf

---

Warren Wind, writing for *New Yorker* magazine, observed, "if there is any one course that is generally regarded as being the most dramatic in the world, and quite possibly the best, it is Pebble Beach." (PX 306). The United States Golf Association ("USGA") noted in its magazine *Golf Journal*, "Pebble Beach is one of the world's marvels, certainly one of the three or four best golf courses in the world (some claim it is, indeed, the very best)." (PX 308).

4. A "green fee" is the cost to play a round of golf.

5. A golf course uses a "signature" hole as a "trademark" hole to advertise its course. Usual-

ly a signature hole has a unique design or beauty that sets the hole apart from the rest of the course and makes the hole memorable.

6. Where the owner of a registered service mark uses the mark in connection with the services specified for five continuous years after the registration date, the mark is deemed "incontestable." 15 U.S.C. § 1065 (1996). Once a mark is incontestable, its registration constitutes conclusive evidence of the registrant's right to exclusive use of the mark in commerce for the services specified, subject only to the seven defenses enumerated in 15 U.S.C. § 1115(b) (1996). *Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1184 (5th Cir. 1980).

historians consider Ross one of the greatest golf course architects. (PX 426, 410). He designed over 600 golf courses in the United States, including several courses ranked in the top 100 in the United States by *Golf Digest* and other trade publications. (PX 426). According to the evidence, Pinehurst No. 2 is considered Ross' masterpiece and is therefore the most famous of the seven courses at the Pinehurst resort.[7] Ross designed the first nine holes for Pinehurst No. 2 in 1903, and the second nine holes in 1907. In 1923 and in 1935 he added holes 3 through 6 to the front 9 to create Pinehurst No. 2 as it exists today. The resulting course is frequently referred to simply as "Pinehurst." The evidence indicates that Pinehurst No. 2 is famous among golfers, and like Pebble Beach, Pinehurst became famous in part because major professional tournaments have been held there.[8] Pinehurst No. 2 was recently selected as the site for the 1999 U.S. Open Championship. Additionally, Pinehurst No. 2 has been ranked consistently among the top golf courses by golf publications; for many years it has been ranked second by *Golf Digest,* behind Pebble Beach, among the best public golf courses in the United States.

The notoriety of Pinehurst coupled with Pinehurst's own national marketing and advertising efforts throughout the United States bring golfers from all over the United States to play the Pinehurst golf courses. Pinehurst spends thousands of dollars each year to advertise itself in national golf and travel magazines and in advertisements fo-

cused on Texas. Approximately five to six percent of Resorts' business comes from Texas. Like Pebble Beach, Resorts is an exclusive golf destination resort and its prices reflect its exclusivity. Green fees and a golf cart for a round of golf on Pinehurst No. 2 are approximately $145.00.

Tour 18 included in its Humble, Texas course a replica of Pinehurst No. 2 Hole 3. Hole 3 is a par four that emphasizes the elements and attributes of the Donald Ross design. Specifically, Hole 3 has a natural area of sand interspersed with clumps of wire grass, which is indigenous to the local area, that extends between 200 and 300 yards along the right side of the fairway. Adjacent to the natural area is a sand cart path.

As stated above, Pinehurst and its No. 2 golf course are famous among golfers. In contrast, the evidence at trial was insufficient to show that the individual hole copied by Tour 18–Pinehurst No. 2 Hole 3–is famous among golfers. Pinehurst No. 2 Hole 3 is not the course's signature hole.[9] Additionally, Resorts does not emphasize Pinehurst No. 2 Hole 3 in advertisements or other promotional materials.

Resorts owns the federal service mark PINEHURST for golf course services, Reg. No. 1,601,470. However the service mark is not incontestable.[10] Resorts does not own a federal trademark registration for the design of Pinehurst No. 2 Hole 3. Resorts does not

---

7. *Golf Digest* referred to Pinehurst as follows: "No. 2 remains today a course every architect admires but doesn't dare imitate if he wants to stay in business. It's a course whose style is so subliminal that some visitors and even some members can't see it. Now and then one will say aloud that he prefers another of the five courses that have been built for the resort since Ross died. That can draw a laugh even from their architects. No. 2 then, is not for everybody. If adventure is what you are looking for in a round of golf-and who isn't-then it all depends on what your idea of adventure is. To some people it is hunting lions in Africa. To others it's a visit to Disneyland. To still others it's discovering Mozart. No. 2 is mostly Mozart." (PX 410).

8. Pinehurst No. 2 has hosted many professional golf tournaments, including major championships conducted by the USGA, the PGA Tour, and the International Ryder Cup.

9. Indeed the evidence shows that one of the attributes of Pinehurst No. 2 is that it has no signature hole. Rather, as one witness stated, the individual holes at Pinehurst No. 2 are meant to "fit together like a hand in glove."

10. An incontestable service mark is *conclusive* evidence of the registrant's right to exclusive use of the mark in commerce subject only to a few enumerated defenses. *Soweco,* 617 F.2d at 1184. In contrast, where a registered service mark has not achieved incontestability, its registration constitutes *prima facie* evidence of the registrant's exclusive right to use the mark in commerce for the services specified in the registration. *Id.* A contestable registration is subject to "any legal or equitable defense or defect which might have been asserted if such mark had not been registered." *Id.;* 15 U.S.C. § 1115(a).

have a copyright, design patent or utility patent on Pinehurst No. 2 Hole 3.

### C. Harbour Town Golf Links

Sea Pines Company and the Sea Pines resort area in South Carolina were established in 1956 when Charles Fraser purchased and began to develop the southern end of Hilton Head Island. At the time, Hilton Head Island had an abundance of wildlife and a few inhabitants, but no hotels, no telephone, no electricity, no medical facilities, no modern stores, and only one paved road. Sea Pines began constructing the first resort facilities in 1957, and went on to build Sea Pines Plantation, the first golf course, tennis club, and planned community on the island.

In 1965, Fraser began planning for the development of a small resort community within Sea Pines, which he named Harbour Town. In 1968 Sea Pines Company began construction of a lighthouse, the Harbour Town Golf Links, a racquet club, condominiums, and other resort facilities. Harbour Town was established within a section of Sea Pines with particularly spectacular views of an area of the Atlantic Ocean named the Calibogue Sound. Fraser built a residential community patterned after European fishing villages, including the Harbour Town lighthouse, shops, and restaurants adjacent to a small marina. Fraser commissioned Pete Dye and Jack Nicklaus to build a world-class golf course across the small harbor from the lighthouse.[11] The golf course was hurriedly completed in 1969 since earlier in the year Fraser had secured for the course a PGA Tour tournament named the Heritage Classic. The lighthouse, which Sea Pines Company then owned along with the rest of the Harbour Town development, was completed shortly thereafter in 1970.

Tour 18 replicated the 18th Hole at Harbour Town for both its Humble, Texas and Flower Mound, Texas golf courses. On both of these replica holes, Tour 18 constructed replica lighthouses. The genuine Harbour Town lighthouse is octagonal in shape with red and white striping. While the lighthouse is visible from the tee box and fairway of the 18th Hole, it is not physically on the golf course. The lighthouse is actually situated 100 feet from the 18th green across a small inlet of water leading to the Harbour Town marina. Fraser testified that the lighthouse was placed in this position so that television cameras broadcasting professional tournaments would show the lighthouse at the end of the 18th Hole. Fraser stated "You could not televise golf without simultaneously televising the lighthouse. That was a deliberate location of that trademark." Tr. at 1230. Additionally, there was testimony at trial that because of the location of the lighthouse, many golfers use it as a target to line up their tee shots. However, according to Fraser, his placement of the lighthouse in relation to the 18th hole was not to create a target for golfers, but to guarantee exposure for the lighthouse on television during professional tournaments.

Each year Sea Pines attracts thousands of vacationers and hosts major professional golf and tennis tournaments. Sea Pines operates several championship golf courses in the Sea Pines resort area. However, it is Harbour Town Golf Links that is the most famous and critically acclaimed of the golf courses. Like Pebble Beach and Pinehurst, the evidence shows that Harbour Town Golf Links is consistently ranked as one of the best golf courses in the United States by golf publications. *Golf Digest* ranked Harbour Town Golf Links among the top twenty golf courses. (PX 500). Furthermore, much of the fame and reputation of Harbour Town Golf Links among golfers results from the course's association with the lighthouse. As Fraser had intended, the distinctive appearance and towering presence of the lighthouse, televised during tournaments and pictured in golf publications every year, has come to symbolize the Harbour Town golf

---

11. According to the evidence, Dye is regarded as one of the preeminent golf course designers today. Jack Nicklaus, widely known among the golfing public as possibly the greatest golfer of all time, has also become known as an accomplished golf course designer. Referring to the

design of Harbour Town Golf Links, *Golf Magazine* stated, "Jack Nicklaus, the greatest golfer of all time, and Pete Dye, the leading iconoclast of golf architecture, collaborated on a course design only once. The result is as strong as anything either has laid out alone." (PX 514).

course. As one witness at trial stated, Harbour Town Golf Links "is famous on its own design merits, but the lighthouse is the visual symbol in everybody's mind when they think of Harbour Town." (PX 515).[12]

Not only is the overall Harbour Town golf course famous, but the course boasts one of the most famous holes in golf, the scenic 18th Hole. While the 18th Hole is memorable for its picturesque waterside vistas, its fame is due in large part to the presence of the lighthouse as the hole's backdrop. Because of the public's association of the 18th Hole with the lighthouse, the hole is often referred to as the "Lighthouse Hole." Indeed Tour 18 uses this nickname in its advertisements and on its golf course signs to refer to its replica of Harbour Town Hole 18. Furthermore, while Pebble Beach and Pinehurst have not used their 14th and 3rd holes, respectively, in advertisements for their courses, the evidence shows that the 18th Hole is the signature hole for Harbour Town Golf Links and Sea Pines frequently places depictions of the 18th Hole and lighthouse in its advertisements and promotional brochures. Sea Pines spends several hundred thousand dollars annually to advertise the Harbour Town Golf Links. Favorable publicity combined with Sea Pines' promotional efforts has resulted in golfers from all over the country, including Texas, traveling to play Harbour Town. Green fees at Harbour Town Golf Links are $164.00.

Since at least 1969, Sea Pines has featured the lighthouse in various corporate logos and has placed these logos on a wide array of promotional materials, advertisements, and soft goods including clothing, novelty items, and sporting goods. However, the evidence also shows that Sea Pines used the "Compass Rose" as a service mark at various times prior to 1991.[13] In 1991, Sea Pines adopted the lighthouse as its corporate logo and service mark. Furthermore, in 1991 and 1992 Sea Pines obtained several trademark and service mark registrations for its lighthouse logo for soft goods, real estate services, and resort hotel services.[14] While prior to 1991 Sea Pines used the Compass Rose as a mark for the entire Sea Pines community, a logo of the lighthouse, even before 1991, was consistently used as the mark for Harbour Town Golf Links in brochures and various advertisements.

While Sea Pines Company constructed and originally owned the lighthouse, Sea Pines' predecessors[15] sold the physical structure to another company in 1984 which then sold it to Prudential Bache–Fogelman Properties ("Fogelman"). However, Sea Pines retains various federal trademark registrations of the lighthouse for soft goods such as t-shirts and other souvenirs. Furthermore, Sea Pines entered into a licensing agreement with Fogelman to allow use of depictions of the lighthouse by Fogelman. (PX 615).

Sea Pines does not own a federal registration for the service mark HARBOUR TOWN. The design of the lighthouse is not protected by any copyright, design patent, or utility patent. Furthermore, Sea Pines does not own a federal service mark registration for the lighthouse for golfing services. The design of Harbour Town Hole 18 is not protected by any copyright, design patent, or utility patent; nor does Sea Pines own a federal trademark registration for the design of Harbour Town Hole 18.

## D. Tour 18

Three men, Dennis Wilkerson, Barron Jacobsen, and Jim Williams, decided to build a

---

12. Barron Jacobsen, Tour 18's co-founder and Director of Marketing Golf, also testified not only that the Harbour Town lighthouse is famous, but that he could think of only two other landmarks in all of golf that were even arguably more famous than the Harbour Town Lighthouse. The April 1993 edition of *Golf World* includes a picture of the 18th Hole at Harbour Town with the lighthouse in the distance and the caption: "The 18th at Harbour Town–the most recognizable walk in golf." (PX 515).

13. The Compass Rose is a logo consisting of a ship's compass with a rose draped across it.

14. These registrations include Nos. 1,658,006 (metal money clips); 1,679,455 (clothing); 1,679,500 (golf balls, equipment); 1,684,476 (novelty items); 1,649,014 (real estate services); 1,655,075 (resort hotel services).

15. In the 1970's Sea Pines Company sold the Sea Pines Resort area to another company, only to repurchase it in the late 1980's. It was during the period when Sea Pines Company no longer owned the resort that the lighthouse was sold to Fogelman.

public golf course on land owned by Wilkerson's father located in Humble, Texas, northwest of Houston. They knew that in order for their course to be successful, it would need well-designed golf holes. Therefore, the men considered hiring a famous golf course architect to design their course. However, after preliminary investigation, the men determined that hiring a prominent golf course architect would be costly and yet might not guarantee the success of their venture. Therefore, the men decided to replicate golf holes from famous golf courses in the United States and to name their course "Tour 18."

In order to select holes to be replicated for their golf course, the men traveled to a number of courses around the United States, researched golf courses in books, and consulted engineers and architects. The men selected holes for their course based on several criteria including the fame of the course, the fame of the hole itself, and their ability to replicate the hole taking into consideration the geography, topography, and natural vegetation of their land in Humble. After considering hundreds of golf holes, the men selected 18 holes to copy for Tour 18, three of which they copied from plaintiffs' golf courses: Pebble Beach Hole 14, Harbour Town Hole 18, and Pinehurst No. 2, Hole 3. The Tour 18 course in Humble, Texas contains replicas of the following golf holes:

| Tour 18 Hole | Original Hole and Location |
| --- | --- |
| 1 | Harbour Town # 18 (Hilton Head Island, S.C.) |
| 2 | Bay Hill # 6 (Orlando, Fla.) |
| 3 | Pinehurst No. 2, Hole 3 (Pinehurst, N.C.) |
| 4 | Inverness # 18 (Toledo, Ohio) |
| 5 | Augusta National # 11 (Augusta, Ga.) |
| 6 | Augusta National # 12 (Augusta, Ga.) |
| 7 | Augusta National # 13 (Augusta, Ga.) |
| 8 | LaCosta # 4 (Carlsbad, Ca.) |
| 9 | Sawgrass # 17 (Ponte Vedra, Fla.) |
| 10 | Desert Inn # 10 (Las Vegas, Nev.) |
| 11 | Disney # 6 (Orlando, Fla.) |
| 12 | Colonial # 3 (Ft. Worth, Tex.) |
| 13 | Pebble Beach # 14 (Pebble Beach, Ca.) |
| 14 | Oakmont # 3 (Oakmont, Penn.) |
| 15 | Shinnecock Hills # 8 (Long Island, N.Y.) |
| 16 | Merion # 11 (Philadelphia, Pa.) |
| 17 | Oak Tree # 8 (Edmund, Okla.) |
| 18 | Doral # 18 (Miami, Fla.) |

Tour 18's course in Flower Mound, Texas, outside of Dallas, also contains as its 7th hole a replica of Harbour Town Hole 18, including a replica of the Harbour Town lighthouse.

The evidence indicates that the designs of some of the holes selected and copied by Tour 18 are famous among golfers to such a degree that golfers refer to the holes by well-known nicknames including the "Lighthouse Hole," the "Island Hole," "Church Pews," "Amen Corner," and "Blue Monster." However, other holes copied by Tour 18, including Pebble Beach Hole 14 and Pinehurst No. 2 Hole 3, are not famous on their own right, but come from famous golf courses.

III. Building Tour 18

In order to carry out their plan to replicate golf holes, Tour 18's owners required detailed information on the designs of the original holes. Thus, in 1990 and early 1991, Wilkerson and Jacobsen traveled to several golf courses to videotape the golf holes they had selected to copy. Wilkerson and Jacobsen went to Pebble Beach in February 1991 and, without Pebble Beach's knowledge or permission, videotaped the 14th hole for the purpose of replicating the hole. Tour 18's golf course designer, David Edsall traveled to Harbour Town and videotaped the 18th

hole without permission from Sea Pines. Jacobsen traveled to Pinehurst and videotaped the third hole of Pinehurst No. 2 without obtaining permission from Resorts.

After videotáping holes in 1991, Jacobsen and Wilkerson met an engineer, Robert Rauch, who told Wilkerson and Jacobsen that his design firm "RDC" could create computer generated three dimensional golf hole designs from their videotapes and from topographic maps. Thus, Jacobsen and Wilkerson approached Ed Connor, an engineer who owned a company named "Golforms." Connor had recently worked for Pebble Beach and Pinehurst creating computer generated topographic maps of the Pebble Beach greens and the Pinehurst No. 2 golf holes (the "Connor maps"). Connor also had in his possession a topographic map of the entire Pebble Beach Hole 14 that had been created by an outside engineering firm hired by Pebble Beach (the "Bestor" máp). Tour 18 purchased the maps, as well as maps created by Connor for Augusta National, from Connor for approximately $4,000. Wilkerson then sent the maps to RDC in Maryland where the maps and videotapes were used to generate computer blueprints for the replica golf holes. Tour 18 then used the computer blueprints to construct its replica golf holes in Humble. Additionally, Tour 18 constructed a small replica of the Harbour Town lighthouse which is positioned at the end of its replicas of Harbour Town Hole 18 in Humble and Flower Mound. Tour 18's replica lighthouses are made of tin and aluminum and do not have a functioning light.

## IV. Marketing Tour 18

In order to market their course, Tour 18's owners adopted the marketing slogan "America's Greatest 18 Holes." At the entrance to the Tour 18 facility is a sign that states in bold lettering **"Tour 18—America's Greatest Eighteen Holes."** Tour 18 has been aggressive in advertising its golf course in numerous golf magazines and newspapers. In those ads, Tour 18 uses its slogan "America's Greatest Eighteen Holes" as well as other captions that emphasize its concept of replicating famous golf holes:

"Tour 18—A Golfer's Dream; 18 of America's most famous golf holes on one course." (PX. 114).

"Tour 18 is the only golf course of its kind in the world. Each hole is a careful simulation of one of America's most famous golf holes." (PX. 115).

"Featuring exact replicas of some of the top courses in the country, Tour 18 is the greatest collection of holes in golf." (PX. 113).

"We started out with a list of more than 300 of the nation's best holes, and carefully narrowed it down to the best 18." (PX. 112).

Tour 18 places these advertisements and others in both local and national media publications such as the *Houston Chronicle, Golf Digest, Golf Houston, Corporate Golfer,* and other promotional golf brochures and newsletters.

In addition to touting its own name, Tour 18 has used plaintiffs' service marks, PEBBLE BEACH, HARBOUR TOWN, PINEHURST, and depictions of the lighthouse, extensively in its advertising. For example, pictures of Tour 18's replica lighthouse appear on the majority of Tour 18's brochures, including the front cover of the Tour 18 scorecards in Humble and Flower Mound, yardage guide, and promotional mailer. The replica lighthouse appears on the front cover of *Metro Houston Golfer* magazine with the name "Tour 18" at the bottom. The replica lighthouse also appears inside the Tour 18 brochure with the following statement:

Each hole . . . is a painstaking re-creation of one of golf's most famous challenges. You begin with the Lighthouse Hole from Harbour Town (including a replica lighthouse from the Hilton Head Island, S.C. course) and end with the Blue Monster from Doral in Florida. In between there's Amen Corner from Augusta, Ga., the Island Hole from Sawgrass in Florida, the Church Pews from Pennsylvania's Oakmont and historic selections from a dozen other courses-including Pebble Beach and North Carolina's Pinehurst. (PX. 117).

In a March 19, 1994 Tour 18 press release, the following appears:

Your round starts off with Hilton Head's Harbour Town 18 par 4, complete with its trademark red and white stripped [sic] lighthouse. (PX. 115).

A photo of the replica lighthouse appears on the back of Tour 18's promotional brochure with the following caption inside the pamphlet:

Imagine yourself facing the awesome challenge of Augusta's famous Amen Corner, or contemplating Harbour Town's #18 compete with the red and white striped lighthouse to line up your tee shot, then finishing off with Doral's "Blue Monster" but before that, you'll be faced by some of the most renowned golfer's challenges, like ... Pinehurst #3 ... and many others. No this is not a dream, this is Tour 18. Tour 18 is the only golf course of its kind in the world. Each hole is a careful simulation of one of America's most famous golf holes.... Each hole features something unique ... [a]nd with a little imagination you can almost smell the salty air and hear the seals barking as you play Pebble Beach's #14.

Tour 18 supplies its customers with scorecards on which to keep their score. Tour 18 has used two scorecard versions. On both scorecards, the name TOUR 18 appears on the front cover and the names of the golf holes replicated by Tour 18 are placed on the inside to identify Tour 18's replica holes. For example, the phrase PEBBLE BEACH 14 is adjacent to the number 13 on Tour 18's scorecard, indicating that Tour 18's Hole 13 is a copy of the original Pebble Beach Hole 14. A picture of the replica lighthouse appears on the back of the current scorecard. A picture of the replica lighthouse also appears on score card for the Tour 18 Flower Mound course.

Tour 18 also has a yardage guide and book for its customers to purchase if desired. A yardage guide provides golfers with information such as the layout and configuration of the holes including the distance between hazards and the total length of the hole. Tour 18's yardage guide has a picture of the light-

house replica on the front cover and the guide contains a caption describing the layout of each replica hole and some history about the original courses.[16] Tour 18 placed wooden signs at the beginning of each Tour 18 golf hole that inform the golfer which replica hole he or she is playing. For example, on Tour 18 Hole 1, there is a detailed sign with a drawing of the layout of the hole and a caption describing the original hole:

"The Lighthouse Hole"—18th Hole/Harbour Town. One of the most familiar sights in golf is the 18th Hole at Harbour Town Golf Links. Bordered by the Calibogue Sound and dominated by the lighthouse, this hole has become one of the most difficult finishing holes on the PGA Tour.

Tour 18 also uses plaintiffs' service marks in its menu: available at the "Inn on the Tour" restaurant are "The Harbour Town" hamburger, "The Pinehurst" tuna salad, and "Pebble Beach" French Toast.

In sum, Tour 18 uses plaintiffs' service marks frequently and prominently in its brochures, scorecards, and other written materials. Pebble Beach argues that Tour 18's unauthorized use of the mark PEBBLE BEACH in its scorecards, yardage guides, signs, and advertising is unlawful. Resorts also complains of Tour 18's use of the mark PINEHURST in their signs, literature, and advertising. Harbour Town complains of Tour 18's use of the mark HARBOUR TOWN and the depictions of the replica lighthouse in their signs, literature, and advertising.

## V. The Tour 18 Disclaimers

Tour 18 placed disclaimers in many of its written materials and on the signs in front of each Tour 18 golf hole. Tour 18 argues that the disclaimers are sufficient to quell any confusion generated by copying plaintiffs' golf holes and using their service marks.

The original Tour 18 scorecard contains the following notice: "All Tour 18 golf holes are simulations of the originals." The cur-

---

**16.** For example, the caption for Tour 18 Hole 1, which is a replica of Harbour Town Hole 18, states, "Take aim at the famous 'Lighthouse' to avoid Calibogue Sound on the left. Par is good on this demanding hole. Home of the Heritage Classic."

rent scorecard contains the following notice: "The design of this course was inspired by great holes from 16 different golf courses. None of the courses endorse, sponsor, or are affiliated with Tour 18." The same disclaimer appears on Tour 18's yardage guide and promotional brochures.

Attached to the wooden signs standing at each Tour 18 tee box is a disclaimer. At Tour 18 Hole No. 1, which is a replica of Harbour Town Hole 18, is a sign that states: "The design of this hole was inspired by the famous 18th Hole at Harbour Town. Tour 18 is not affiliated with, endorsed, or sponsored by Harbour Town." At Tour 18 Hole 3, which is a replica of Pinehurst No. 2 Hole 3, is a sign that states: "The design of this hole was inspired by the famous 3rd hole at Pinehurst. Tour 18 is not affiliated with, endorsed, or sponsored by Pinehurst." At Tour 18 Hole 13, which is a replica of Pebble Beach Hole 14, is a sign that states: "The design of this hole was inspired by the famous 14th Hole at Pebble Beach. Tour 18 is not affiliated with, endorsed or sponsored by Pebble Beach." An additional sign is attached to the sign at Tour 18's first hole tee box. The sign states, "The design of this course was inspired by the great holes from the 16 different golf courses. None of these courses endorse, sponsor, or are affiliated with Tour 18."

In its current promotional brochure Tour 18 uses photographs of various Tour 18 golf holes. In the bottom right corner of each picture Tour 18 placed the name of the golf course from which the Tour 18 golf hole was copied. For example, there is a photo of Tour 18's replica of Pinehurst No. 2 Hole 3 and appearing in the bottom right corner is the PINEHURST mark. There is also a photo of Tour 18's replica of Harbour Town Hole 18 with the HARBOUR TOWN mark on the photo. Apparently recognizing that placing plaintiffs' names on pictures of its own golf holes might cause consumers to believe that the photos depict plaintiffs' original holes rather than Tour 18's copies, Tour 18 placed the following notice below the last

photo: "Actual Photographs taken at TOUR 18–Houston."

While Tour 18 has placed some disclaimers in most of its promotional brochures, yardage guides, and on the golf course signs, numerous advertisements in newspapers, magazines, and other trade publications have no disclaimers. For example, the cover of the Fall 1994 issue of *Metro Houston Golfer* has a picture of the Tour 18 replica lighthouse and a detailed advertisement for Tour 18 inside the magazine. However, there is no disclaimer in the magazine. Tour 18 also has a mailer that it sends to potential customers. The mailer displays a large drawing of the Tour 18 replica lighthouse and the phrase "Harbour Town Golf Links–the Lighthouse Hole." There is no disclaimer in the mailer.

## VI. Tour 18 Scores an Ace

The evidence at trial showed that since its opening in late 1992, Tour 18 has been extremely successful. In its first year of business Tour 18 made profits of approximately 1.7 million dollars on their initial investment of approximately 5 million dollars to build the Tour 18 Humble course.

Tour 18 is a public "daily fee" golf course [17] with green fees of $55 during the week and $75 on weekends. Tour 18's overwhelming success is evident in that golfers who go to play Tour 18 are willing to pay green fees in excess of those collected by other public daily fee golf courses in Houston of comparable difficulty and quality. As a result, Tour 18 sells more rounds per year and charges higher green fees than the average of comparable daily fee golf courses in the Houston area. Furthermore, Tour 18 in Humble has been so successful that Tour 18 quickly opened another Tour 18 course in Flower Mound, Texas, near Dallas. The evidence indicates that the Dallas course has been equally as successful and profitable as the Houston course. According to Tour 18's owners, Tour 18 is planning to expand into several other cities in the U.S., including possible sites in Arizona, Georgia, and Virginia.

---

**17.** A daily fee golf course, in contrast to a private club, is a course that is open to the public and

allows golfers to pay for each round of golf played.

The evidence shows that Tour 18's success and its ability to compete effectively among other daily fee golf courses in Houston is directly attributable to its concept of replicating golf holes from famous courses and its aggressive advertising of those courses' names. Because of its replica concept, Tour 18 has received frequent publicity on television and in various articles in the *Houston Chronicle, New York Times, Golf Digest, Sports Illustrated, Golf World, Golf Illustrated,* and *Smithsonian.* (PX 126). Invariably, every article emphasizes Tour 18's replica golf hole concept and the ability of golfers to play golf holes from plaintiffs' and other famous courses. Tour 18's own financial advisor who was responsible for obtaining expansion financing for Tour 18 testified that "the value, in my estimation, of Tour 18 is the fact that they've accumulated a number of holes which golfers can relate to and that's the value—that's what differentiates that from any other golf course."

Plaintiffs are not pleased about the success their golf holes and service marks have generated for Tour 18. Asserting claims for federal trade dress and service mark infringement, unfair competition, and dilution, plaintiffs argue that Tour 18 misleads golfers about the quality and difficulty of plaintiffs' golf holes and has damaged and diluted the good will and strong reputations of their golf courses.

### SERVICE MARK INFRINGEMENT AND UNFAIR COMPETITION

Plaintiffs claim that Tour 18's use of their service marks PEBBLE BEACH, PINEHURST, HARBOUR TOWN, and the lighthouse at Harbour Town constitutes service mark infringement and unfair competition in violation of Lanham Act sections 32(1) and 43(a). 15 U.S.C. §§ 1114(1), 1125(a) (1996).

Section 32(1) of the Lanham Act governs claims for infringement of federally registered service marks. To recover for infringement of a registered service mark under section 32(1), a plaintiff must establish, first, that its mark is valid, and second, that the defendant's use of the mark is likely to cause confusion. A defendant is then liable for infringement if he uses (1) any reproduction, counterfeit, copy or colorable imitation of the mark; (2) without the registrant's consent; (3) in commerce; (4) in connection with the sale, offering for sale, distribution or advertising of any goods; (5) where such use is likely to cause confusion or to cause mistake or to deceive. 15 U.S.C. § 1114(1)(a); *Boston Professional Hockey Association, Inc. v. Dallas Cap & Emblem Mfg., Inc.,* 510 F.2d 1004, 1009–10 (5th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975).

Section 43(a) of the Lanham Act provides a civil cause of action for infringement of unregistered marks.[18] In order for an unregistered mark to be protectable under section 43(a), the mark must be capable of distinguishing the plaintiff's services from those of others. *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992). This standard is met when the mark is "*either* (1) is inherently distinctive *or* has acquired distinctiveness through secondary meaning. *Id.* Infringement is then established through a showing of likelihood of confusion. A cause of action for unfair competition is also provided for in section 43(a).

### A. Validity of Plaintiffs' Service Marks

Proof of registration of a service mark with the United States Patent and Trademark Office ("PTO") is *prima facie* evidence of the registrant's exclusive right to use the

---

**18.** The 43(a) prohibition on trademark infringement and unfair competition provides in relevant part:

(1) Any person who, in on or in connection with any goods or services ... uses in commerce, any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, or false or misleading representation of fact, which—

(a) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person

Shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

registered mark in commerce for the services specified in the registration, but it does not preclude an opposing party from "proving any legal or equitable defense or defect which might have been asserted if such mark had not been registered." 15 U.S.C. § 1115(a); *Soweco*, 617 F.2d at 1184. If however, a registrant has used its mark in connection with the services specified for five continuous years after the registration date and filed an appropriate affidavit, the mark is deemed "incontestable." 15 U.S.C. § 1065. Ownership of an incontestable mark constitutes conclusive evidence of the registrant's right to exclusive use of the mark in commerce for the services specified in the registration, subject only to the few defenses enumerated in 15 U.S.C. § 1115(b). *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 195–96, 105 S.Ct. 658, 662, 83 L.Ed.2d 582 (1985); *Soweco*, 617 F.2d at 1184.

In analyzing the validity and strength of a trade or service mark, the Court analyzes the mark in accordance with the classic trademark taxonomy set out by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2nd Cir.1976). Specifically, a trade or service mark may be (1) fanciful; (2) arbitrary; (3) suggestive; (4) descriptive; or (5) generic. Fanciful, arbitrary, or suggestive marks are inherently distinctive and protectable without a showing of secondary meaning. *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 425 n. 3 (5th Cir.1984).[19] Generic marks are never protectable, and descriptive marks are protectable only on a showing of secondary meaning. *Id.*[20]

### 1. PEBBLE BEACH

Pebble Beach provided evidence showing that it owns federal service mark number 1,065,027, which consists of the phrase PEBBLE BEACH and is for "providing golfing facilities." Pebble Beach also provided evidence that it has used the mark continuously and in connection with the provision of golfing services for over five years. Therefore, the mark PEBBLE BEACH is incontestible and is conclusive evidence of Pebble Beach's exclusive right to use the mark in commerce for the services specified.[21] 15 U.S.C. §§ 1057(a), 1115(a).

### 2. PINEHURST

Resorts owns federal service mark number 1,601,470 for the phrase PINEHURST for golf course services. Unlike PEBBLE BEACH, PINEHURST is not an incontestable mark. However, receipt of a registration for the mark PINEHURST automatically invokes a statutory presumption that the mark is valid and protectable. 15 U.S.C. § 1115(a). The presumption of validity given to a registered mark shifts the burden of proof to the party challenging the validity of the mark. *Burke–Parsons–Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 593 (6th Cir.1989).

To rebut this prima facie showing, Tour 18 argues that Resorts obtained its registration for the mark PINEHURST through fraud on the Patent and Trademark Office ("PTO"). Specifically, Tour 18 presented evidence that "Pinehurst Country Club" in Denver, Colorado has used the name PINEHURST since its inception in 1958. Tour 18 claims that when Resorts filed its application to register the mark PINEHURST for country club ser-

---

**19.** An example of a fanciful mark is "Xerox" since it consists of words that do not exist in every day language. Arbitrary marks consist of words that are part of every day language but which are arbitrarily applied to a particular good. For example, "Blue Bell" as applied to ice cream is arbitrary. An example of a suggestive term is "Penguin" for food freezers since the mark suggests some characteristics of the goods to which it attached.

**20.** An example of a generic mark is "Aspirin" while examples of descriptive marks are "Chap Stick" for lip balm or "Alo" for aloe vera lotion.

**21.** Tour 18 contends that PEBBLE BEACH is a geographically descriptive phrase that requires a showing of secondary meaning to be protectable. However, "[a]n incontestable mark cannot be challenged as lacking secondary meaning; such marks are conclusively presumed to be non-descriptive or have acquired secondary meaning." *Soweco*, 617 F.2d at 1184. Thus, Tour 18 may not attack the validity of the mark on grounds of geographic descriptiveness; it is presumed to have secondary meaning. *Park 'N Fly*, 469 U.S. at 195–96, 105 S.Ct. at 662–63.

vices, it made sworn statements to the PTO attesting that it had no knowledge of existing uses of the mark PINEHURST. Tour 18 contends that contrary to Resorts' declaration, it had actual knowledge of Pinehurst Country Club's "prior" use of the mark PINEHURST for country club services and therefore committed fraud on the PTO in obtaining its registration.

A senior user of a mark is entitled to claim exclusive rights and seek a federal registration even though there may exist and it knows of a junior user of the mark. *Citibank, N.A. v. Citibanc Group, Inc.,* 724 F.2d 1540 (11th Cir.1988); *see* 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 31.21[3][d][ii] (3rd ed. 1996) (hereinafter referred to as "McCarthy") ("If an applicant has a good faith belief that it is the senior user, then the oath cannot be fraudulent. Any alleged failure to disclose use by junior users is irrelevant and could not be material to the grant of a federal registration."). In this case, the evidence conclusively shows that Resorts and its predecessors have used the mark PINEHURST to signify its golfing services since 1898. Pinehurst Country Club in Denver has used the mark only since the club's creation in 1958. Whether Resorts knew of Pinehurst Country Club's use of the mark PINEHURST when it made its application to the PTO is irrelevant since Resorts had a good faith belief that it was the senior user of the mark. Thus, Resorts' registration of the mark without mention of Pinehurst–Denver's junior use of the mark does not constitute fraud on the PTO.

Tour 18 also challenges the validity of the PINEHURST mark by arguing that it is geographically descriptive. Terms that are descriptive of a geographic location or origin of goods or services are not inherently distinctive. Therefore, such marks can only be protected under the Lanham Act if they have achieved secondary meaning. *Boston Beer Co. v. Slesar Bros. Brewing Co., Inc.,* 9 F.3d 175, 180 (1st Cir.1993). A mark is geographically descriptive if it describes to consumers the geographic origin of the goods or services rather than the source of the

goods or services. *Appalachian Log Homes, Inc.,* 871 F.2d at 594.

Since PINEHURST is a registered mark, it is presumed valid and Tour 18 has the burden of presenting sufficient evidence indicating that "Pinehurst" is geographically descriptive. To make this showing, Tour 18 presented evidence that Pinehurst is designated as a location on a map and that there are highway signs indicating the route to Pinehurst. Tour 18 did not offer a consumer survey or other empirical evidence indicating that consumers associate the mark PINEHURST with a geographic location in North Carolina.

Resorts argues that the mark PINEHURST is not descriptive but is an arbitrary mark that is entitled to protection without proof of secondary meaning. Where a developer chooses an arbitrary mark to designate a development, the mark is protectable despite the geographic aspects of the development. *See Prestwick, Inc. v. Don Kelly Bldg. Co.,* 302 F.Supp. 1121, 1124 (D.Md.1969) (mark "Tantallon" when used for a planned community was not geographically descriptive since it had "no generally known geographic significance" and prior to the development the area had no general geographic name); *In re Pebble Beach Co.,* 19 U.S.P.Q.2d 1687 (T.T.A.B.1991) (holding that the mark "17 Mile Drive" was not geographically descriptive since the term was created by Pebble Beach Company's predecessor to denote a scenic seventeen mile stretch of road within the Del Monte Forest). PINEHURST is an arbitrary name selected by the developer of the Pinehurst resort. Thus, the mark is inherently distinctive and not geographically descriptive. Furthermore, if there is any geographic connotation to PINEHURST, such meaning has developed over time since the creation of the Pinehurst resort and is directly attributable to the growth and success of the resort. *See Prestwick,* 302 F.Supp. at 1123.

Alternatively, even if Tour 18 had carried its burden of showing that PINEHURST is geographically descriptive, the mark is still protectable if Resorts can show that the mark has achieved secondary meaning. A geographically descriptive mark has

secondary meaning when the mark no longer causes the public to associate the goods or services with a particular place, but with a particular, albeit anonymous, source. *Boston Beer*, 9 F.3d at 181. Factors to be considered in determining whether a term has acquired secondary meaning include: (1) the length and manner of use of the mark by the plaintiff; (2) the nature and extent of advertising and promotion of the mark; (3) efforts made to promote a conscious connection, in the consumer's mind, between the mark and a particular product or service; and (4) the defendant's intent in copying the mark. *Id.* at 182.

■ After considering the evidence, the Court finds that the mark PINEHURST has achieved secondary meaning due to Resorts' long and exclusive use of those service marks and the notoriety of the PINEHURST mark as demonstrated by the multitude of books, articles, and other media coverage given to the resort and No. 2 course. Additionally, Resorts' considerable advertising efforts and expenditure of money toward developing a reputation and goodwill for its PINEHURST mark justifies a finding of secondary meaning. *Zatarains Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 795 (5th Cir.1983). Pinehurst conducts an extensive nationwide marketing campaign by placing advertisements in numerous national golf publications such as *Golf* and *Golf Digest* magazines. Pinehurst has also been aggressive in seeking out major professional golf tournaments to further the national reputation of the course and resort. The No. 2 course was recently named the host course for the 1999 U.S. Open, one of only four "Grand Slam" tournaments held each year.[22] All of these factors weigh in favor of a finding of secondary meaning.

Lastly, evidence indicating that Tour 18 intentionally copied the exact mark PINEHURST and uses it frequently and prominently in its advertising and promotional brochures is strong evidence of secondary meaning. *Vision Sports Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir.1989). In-

deed, while Tour 18 disputes the fame and distinctiveness of Pinehurst No. 2 Hole 3, Tour 18 has never disputed that the overall Pinehurst No. 2 golf course is a famous golf course. Thus, if PINEHURST is viewed as a geographically descriptive term, it has acquired a secondary meaning apart from its geographic connotations.

### 3. HARBOUR TOWN

Sea Pines seeks protection for the mark HARBOUR TOWN. Although Sea Pines does not own a federal service mark registration for HARBOUR TOWN, it is entitled to protection as a common law service mark pursuant to Lanham Act section 43(a) if it is either inherently distinctive or has acquired secondary meaning. 15 U.S.C. § 1125(a).

■ Tour 18 argues that the phrase HARBOUR TOWN is not protectable as a service mark because it is geographically descriptive. For the same reasons the Court found PINEHURST inherently distinctive and not geographically descriptive, the Court finds here that HARBOUR TOWN is not geographically descriptive. Specifically, HARBOUR TOWN is an arbitrary mark chosen by its developer to designate its goods and services and has always been associated with Harbour Town and its golf course services. *In re Pebble Beach*, 19 U.S.P.Q.2d at 1688. Therefore HARBOUR TOWN is not geographically descriptive and is protectable absent secondary meaning.

■ Alternatively, even assuming HARBOUR TOWN is geographically descriptive, Sea Pines demonstrated that HARBOUR TOWN has achieved secondary meaning. Sea Pines has continuously used the mark HARBOUR TOWN for golfing services since the course was completed in 1969. Furthermore, as a public course whose success depends on golfers who travel from around the world to play, Sea Pines has been aggressive in marketing its course nationwide. Even before the Harbour Town course was completed, Sea Pines' predecessors convinced the PGA to hold an annual tournament—the

**22.** The other three "Grand Slam" tournaments or "Majors" are the British Open, the Masters, and the PGA Championship.

MCI Heritage Classic—at Harbour Town Golf Links. The tournament has added fame, national reputation, and goodwill to the HARBOUR TOWN mark. Finally, Tour 18's intentional copying of the HARBOUR TOWN mark and use of the mark prominently in its advertisements and promotional brochures is strong evidence of secondary meaning. Therefore, this Court finds that the mark HARBOUR TOWN is a valid protectable common law service mark for Sea Pines.

### 4. The Lighthouse at Harbour Town

Sea Pines does not own a registered mark for the lighthouse for golfing services.[23] However, Sea Pines claims a common law service mark in depictions of the lighthouse for golfing services. Tour 18 challenges the validity of the lighthouse as a service mark for Sea Pines on three separate grounds. First, Tour 18 argues that Sea Pines may not assert any service mark interest in the lighthouse because it no longer owns the physical structure. Second, Tour 18 contends that Sea Pines abandoned any service mark rights in the lighthouse during the 1980's when Sea Pines used the Compass Rose and not the lighthouse as its corporate mark. Finally, Tour 18 argues that Sea Pines has allowed uncontrolled licensing and use of the lighthouse as a mark to such an extent that it has lost its significance or distinctiveness as an indicator of source for Harbour Town Golf Links.

■ The Lanham Act provides that a mark is deemed abandoned when its use has been discontinued with an intent not to resume use or, "when any course of conduct of the registrant, including acts of omission as well as commission, causes the mark to lose its significance as an indication of origin." 15 U.S.C. § 1127.[24] Abandonment is an affirmative defense on which defendants bear the burden of proof. *Exxon Corp. v. Humble Exploration Co., Inc.*, 695 F.2d 96, 99 (5th Cir.1983).

■ The evidence does not support Tour 18's contention that Sea Pines abandoned the lighthouse as an identifying mark. While Sea Pines Company used the Compass Rose as its corporate logo in the 1980's, the lighthouse was still used during that period as a mark for Harbour Town Golf Links and Sea Pines used representations of the lighthouse on various soft goods in its golf shops. Nor has Tour 18 presented any evidence demonstrating an intent by Sea Pines to abandon the mark as an indicator of source. To the contrary, Sea Pines' continual use of the lighthouse to designate Harbour Town Golf Links and the company's adoption of the lighthouse as its logo and mark in 1991 confirm this conclusion. Furthermore, since Sea Pines' predecessors reserved trademark rights in depictions of the lighthouse when the physical structure was sold in 1985, Tour 18's argument that the mark has been abandoned holds little weight. Indeed Sea Pines entered into a trademark licensing agreement with Fogelman granting Fogelman the right to use the lighthouse as a mark in its business. (PX 614).[25]

■ Likewise, Tour 18's argument that Sea Pines abandoned the lighthouse as an

23. As mentioned above, Sea Pines filed a trademark registration for their lighthouse logo for use on soft goods and souvenirs. Sea Pines does not, however, own a registered trade or service mark for the lighthouse for golfing services.

24. 15 U.S.C. § 1127 provides, in relevant part,

A mark shall be deemed "abandoned" if either of the following occurs:
(1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of that mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

(2) When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark. Purchaser motivation shall not be a test for determining abandonment under this paragraph.

25. While Tour 18 argues that the agreement between the parties is a "naked" license, the Court disagrees since the agreement contains adequate controls for maintenance of the mark, assignability, and scope of the agreement. *See Sheila's Shine Products, Inc. v. Sheila Shine, Inc.*, 486 F.2d 114 (5th Cir.1973); *American Foods, Inc. v. Golden Flake, Inc.*, 312 F.2d 619, 624 (5th Cir. 1963).

identifying mark by failing to police third party uses is not supported by the law or evidence. While the existence of multiple users of a mark may be relevant to assessing the strength or weakness of a mark, *Amstar Corp. v. Domino's Pizza,* 615 F.2d 252, 259 (5th Cir.1980), such uses are not relevant to a finding of abandonment. 2 McCarthy § 17.05 at 17–25. Furthermore, even if the Court considers the third party uses cited by Tour 18, they are uses unrelated to golfing services. Therefore they do not establish that the lighthouse has lost its ability to act as an identifier of source for Sea Pines' golfing services.

Contrary to Tour 18's argument, the evidence indicates that Sea Pines has aggressively policed third party uses of the lighthouse. Sea Pines submitted numerous examples of cease and desist letters and other correspondence sent by its attorneys and corporate directors to third party users of depictions of the lighthouse requesting that they discontinue using the lighthouse in their advertisements. (PX 572–585, 589–615). Sea Pines also presented evidence of numerous licensing agreements it has entered into allowing third parties to use the lighthouse in advertising and other promotional efforts for beer cans, travel magazines, greeting cards, calendars, and other products. (PX 614, 615, 618–623). These licenses, combined with the numerous cease and desist letters, indicate that Sea Pines has never had an intent to abandon its rights in the lighthouse. Rather, the evidence shows a clear intent by Sea Pines to maintain the lighthouse as an identifier of source for its golf and resort service. Furthermore, the mere fact that Tour 18 copied the lighthouse and uses it prominently in much, if not most, of its advertising materials is testament to the strength and value of the lighthouse as an indicator of source for Harbour Town.

 Tour 18 also argues that Sea Pines may not assert service mark rights in the lighthouse because Sea Pines does not own the physical structure. The Lanham Act does not require a party to "own" a word, symbol, or other identifying mark before it may be granted protection from infringement. Rather, all that is required is that a party "use" the mark in commerce to identify its services and distinguish them from the services of others. 15 U.S.C. § 1127;[26] *see Boston Hockey,* 510 F.2d at 1014 (noting that under trademark law, a party acquires rights to a symbol in the public domain through use of the mark and the public's association of the mark with the user). In this case, the evidence shows that since 1969 Sea Pines has used the lighthouse as an identifying mark for its golfing services at Harbour Town Golf Links. Additionally, the evidence indicates that over time and through Sea Pines' use of the lighthouse as a service mark, the public has come to associate the lighthouse as a designator of source for Harbour Town Golf Links. Therefore, the Court finds that the Harbour Town lighthouse is a valid, enforceable service mark designating Sea Pines' golfing services at Harbour Town Golf Links.

### B. Likelihood of Confusion

 Infringement of a valid service mark occurs when there is a likelihood of confusion among the relevant class of customers and potential customers that is generated by the defendant's use of the plaintiffs' mark. 15 U.S.C. §§ 1114(1), 1125(a). Tour 18 argues that there is no likelihood of confusion arising from its use of plaintiffs' service marks because golfers playing Tour 18 in Houston, Texas will not be confused into believing they are actually in, for example, California playing Pebble Beach Golf Links. Tour 18 reads the confusion requirement too narrowly. Courts have consistently applied an expansive interpretation of likelihood of confusion, holding that " 'likelihood of confusion' may be found absent confusion as to source; trademark infringement occurs also 'when the use sought to be enjoined is likely to confuse purchasers with respect to ... [the products'] endorsement by the plaintiff

---

**26.** A service mark is a "word, name symbol, or device, or any combination thereof ... used ... to identify and distinguish the services of one person ... from the services of another and to indicate the source of the services, even if that source is unknown." 15 U.S.C. § 1127.

or its connection with the plaintiff.'" *Fuji Photo Film v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 596 (5th Cir.1985) (quoting *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 384 (5th Cir.1977)); *Nike, Inc. v. "Just Did It" Enters.*, 6 F.3d 1225, 1228 (7th Cir.1993); *Jordache Enters., Inc. v. Levi Strauss*, 841 F.Supp. 506, 514–15 (S.D.N.Y.1993). While golfers at Tour 18 may not be confused as to source since they will know they are playing a replica constructed by Tour 18 and not the real Pebble Beach Hole 14, they may still be confused into believing Pebble Beach sponsored or approved Tour 18's use of their service marks and golf hole designs or that the parties are otherwise affiliated. *See Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1116 (6th Cir.1996);[27] *Moore Business Forms, Inc. v. Ryu*, 960 F.2d 486, 491 (5th Cir.1992) (consumer's confusion involving perceived affiliation or sponsorship between the parties was actionable). Furthermore, courts may consider evidence showing that consumers assumed the owner of a mark gave "permission" to the alleged infringer to use the mark. *Anheuser-Busch, Inc. v. Balducci Publications*, 28 F.3d 769, 772, 775 (8th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 903, 130 L.Ed.2d 787 (1995) (treating false assumption of permission as evidence of actual confusion, and as synonymous with a false assumption of the statutory term "approval" in Section 43(a)); *University of Georgia v. Laite*, 756 F.2d 1535, 1546 (11th Cir.1985) (holding that 10–15 people who falsely assumed that defendant had permission to use plaintiff's mark was "persuasive" evidence of actual confusion). Thus, the relevant inquiry in this case is whether Tour 18's use of plaintiffs' service marks is likely to cause consumers to believe that the parties or their services are affiliated in some manner or that plaintiffs sponsored or otherwise gave permission to Tour 18 to copy their golf holes or use their service marks.

■■■ In determining whether there is a likelihood of confusion, the Court may consider a number of factors including: (1) the type or strength of plaintiff's mark; (2) the degree of similarity between plaintiff's and defendant's marks; (3) the similarity between plaintiff's and defendant's goods or services; (4) the identity of plaintiff's and defendant's customers; (5) the similarity of plaintiff's and defendants' advertising; (6) the defendant's intent; (7) the existence of actual confusion. *Taco Cabana Int'l v. Two Pesos, Inc.*, 932 F.2d 1113, 1122 (5th Cir.1991), *aff'd*, 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *Roto–Rooter Corp. v. O'Neal*, 513 F.2d 44, 45 (5th Cir.1975). It is not necessary for a plaintiff to show that all or even a majority of the factors are present. *Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1159–60 (5th Cir.1982).

*(a) Strength of plaintiffs' service marks*

■■■ In determining the scope of protection to be given to plaintiffs' marks, the Court must consider the strength and distinctiveness of the marks. "Strong marks are widely protected, as contrasted to weak ones." *Amstar Corp.*, 615 F.2d at 259 (citations omitted). The strength of a service mark for the purposes of analyzing likelihood of confusion is dependent upon both the placement of the mark on the spectrum of distinctiveness, from arbitrary to generic, and the extent to which consumers in the relevant marketplace recognize the mark as an indicator of source. *See Sun Banks of Florida, Inc. v. Sun Federal Sav. & Loan Assoc.*, 651 F.2d 311, 315–16 (5th Cir.1981). Also relevant to a mark's strength is the extent to which third parties use identical or

**27.** In *The Champions Golf Club*, a golf club in Houston named "Champions" sued a club in Kentucky for using the same mark. In an extensive discussion of likelihood of confusion analysis, the Court stated,

> The district court noted that despite their sophistication, golfers would likely be confused about whether the courses were affiliated, but appears not to have appreciated that *this* is the ultimate question to be answered in the likelihood of confusion inquiry. It is not particularly significant … that it is unlikely that any golfer would end up on the first tee at the Nicholasville course, thinking he or she was on the first tee at the Houston course or *vice versa*. The relevant question is whether a golfer … would likely be confused about affiliation between the two clubs.

*The Champions Golf Club*, 78 F.3d at 1121 (emphasis in original).

substantially similar marks in the marketplace. *Id. Amstar Corp.,* 615 F.2d at 259.

Plaintiffs argue that their service marks are arbitrary and therefore strong and entitled to the broadest scope of protection. Tour 18 contends that plaintiffs' service marks are geographically descriptive and therefore weak. Additionally, Tour 18 points to various third party uses of plaintiffs' marks in arguing that Court should narrowly construe the scope of protection accorded plaintiffs' marks.

Tour 18's argument regarding the descriptiveness of plaintiffs' marks is without merit. The Court determined above that the marks PINEHURST and HARBOUR TOWN are not geographically descriptive since they are arbitrary marks chosen to identify their resorts and their golfing services. Additionally, even if HARBOUR TOWN and PINEHURST could be viewed as geographically descriptive marks, the Court also found above that the marks have achieved secondary meaning. Evidence of secondary meaning indicates that a mark has commercial "strength" and recognition among consumers. Furthermore, while the Court did not address above whether the phrase PEBBLE BEACH has secondary meaning,[28] the Court finds here that all three plaintiffs' longstanding and continuous use of their marks for golfing services, combined with their efforts to advertise the marks nationally through a wide variety of media, establish that the service marks are well-known, distinctive marks for plaintiffs' golfing services. *Moore Business Forms,* 960 F.2d at 490.

■ Tour 18 contends that third party uses of the service marks PEBBLE BEACH, PINEHURST, HARBOUR TOWN, and of the lighthouse at Harbour Town indicate that the marks are weak. Third party uses of a mark "merely limit the protection to be accorded plaintiff's mark outside the uses to which the plaintiff has already put its mark." *Amstar Corp.,* 615 F.2d at 259; *American*

*Rice, Inc. v. Arkansas Rice Growers Co-op. Ass'n,* 532 F.Supp. 1376, 1386–87 (S.D.Tex. 1982), *aff'd,* 701 F.2d 408 (5th Cir.1983). Thus, third party uses of plaintiffs' service marks which are unrelated to golf course services are not relevant to a determination of the strength of plaintiffs' marks for golfing services.

■ However, Tour 18 also presented evidence of third party uses of the mark PINEHURST within the golfing services industry. Specifically, "Pinehurst National" and "Pinehurst Plantation" are two private golf courses located within the Pinehurst resort area, and "Pinehurst Country Club," also private, is in Colorado. None of those courses is associated with Resorts. The Court finds that such limited third party uses are not sufficiently widespread or publicized to weaken the strength of Resorts' service mark. *See Moore Business Forms,* 960 F.2d at 490 (single third party use of mark does not detract from strength of mark). Additionally, Resorts is currently involved in trademark litigation with both Pinehurst National and Pinehurst Plantation regarding their uses of the PINEHURST mark. Where a party is involved in litigation to preclude a third party's use of its mark, the third party use is not relevant to the strength or weakness of the mark. *Exxon Corp. v. Texas Motor Exchange of Houston, Inc.,* 628 F.2d 500, 504 (5th Cir.1980).

■ Tour 18 also presented evidence of other golf courses with lighthouses and lighthouse logos to show that Sea Pines' lighthouse service mark is weak. The Court finds that those lighthouses do not weaken the strength of Sea Pines' lighthouse as one of the most famous marks in golf. Specifically, there is no evidence to indicate that the third party lighthouses presented to the Court are used as targets for golfers or are otherwise closely intertwined with the individual golf courses. Additionally, none of the lighthouses or their logos even remotely resemble the Harbour Town lighthouse.

---

**28.** The Court did not address above whether PEBBLE BEACH had achieved secondary meaning because the Court only considered whether the mark was a valid, enforceable mark. As stated above, since PEBBLE BEACH is an incontestable mark, Tour 18 cannot challenge the *va-*

*lidity* of the mark based on geographic descriptiveness. However, the fact that PEBBLE BEACH is incontestable does not prevent Tour 18 from challenging the *strength* of PEBBLE BEACH for the purposes of likelihood of confusion analysis.

Tour 18 also argues that the mark PEB-BLE BEACH is not strong because in a separate lawsuit, *Pebble Beach Company v. Laub America Corporation,* No. 84–20125, 1985 WL 5584 (N.D.Cal. Jan. 17, 1986), the court found that the same mark was not strong for the purposes of determining likelihood of confusion in the soft goods market. Tour 18's reliance on the *Laub* case is unavailing since there, the only issue before the court was whether the mark PEBBLE BEACH was strong within the soft goods market.[29] In contrast, the evidence in this case conclusively shows that PEBBLE BEACH is a strong mark in the golfing services market.

As a final consideration in gauging the strength of plaintiffs' marks within likelihood of confusion analysis, Tour 18's prominent use of plaintiffs' service marks in their advertising and promotional materials highlights the strength of the service marks. Without question Tour 18 relies heavily on, and is successful because of, the strength of plaintiffs' service marks in the minds of golfers. Therefore, after considering both the distinctiveness and marketplace standing of plaintiffs' service marks, the Court finds that they are strong marks for the purposes of determining whether a likelihood of confusion exists.

*(b) Similarity of service marks*

■ In analyzing the similarities between the parties' marks, the marks "must be considered in light of the way the marks are encountered in the marketplace and the circumstances surrounding the purchase of [plaintiffs' and defendant's services]." *Lindy Pen Co., Inc. v. Bic Pen Corp.,* 725 F.2d 1240, 1245 (9th Cir.1984). There is no dispute that Tour 18 uses plaintiffs' service marks PEBBLE BEACH, PINEHURST, and HARBOUR TOWN extensively on its golf course signs to identify its first, third, and fourteenth holes and prominently in its advertising brochures, yardage guides, scorecards, and other advertisements. Additional-

ly, Tour 18 frequently uses representations and depictions of its replica lighthouse in advertisements and promotional materials. While the replica lighthouse is smaller than the original and does not have a functioning light, the similarities between the structures greatly overcome the differences. Indeed achieving this dramatic similarity is what Tour 18 aimed for in replicating the lighthouse and using its appearance in advertisements.

■ Tour 18 contends that its use of plaintiffs' marks is not infringing because plaintiffs' marks are always preceded by or used in conjunction with the TOUR 18 mark on its advertisements and on signs placed on the Tour 18 golf course. It is true that a company's use of its own mark and logo on a product may quell confusion as to the source of the product. *See Lindy Pen,* 725 F.2d at 1245 (holding that although the mark "Auditor's" placed on the defendant's pens was identical to plaintiff's mark "Auditor's", the dissimilar overall appearance of the pens and the dominant appearance of the defendant company's marks and logos on the pens and packaging were sufficient to overcome the confusing similarity of the marks considered in isolation). While Tour 18's use of its own mark is relevant to the analysis, it does not preclude a finding of substantial similarity of marks for the purposes of determining whether there is a likelihood of confusion as to affiliation, sponsorship, or permission. "The presence of a manufacturer's name on a product line is just one of the many factors relevant to determining whether there is a likelihood of confusion." *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 976 n. 24 (11th Cir.1983). In fact, courts have viewed the combination of the alleged infringer's mark with the plaintiffs' mark as an aggravating circumstance since such combinations may lead consumers to assume that there is an affiliation or sponsorship between the infringer and the mark owner. *See Sands, Taylor & Wood Co. v. Quaker Oats*

---

**29.** Specifically, the court in *Laub* stated, "This widespread commercial exploitation of [the mark "Pebble Beach"] reduces the likelihood that consumers would assume, when they encounter that phrase *in connection with softgoods or souvenirs,*

that plaintiff ... is the source of the merchandise." *Id.* at 76 (emphasis added). The court also stated, "Moreover, what strength these marks have is tied directly to golfing facilities, not to softgoods or souvenirs." *Id.* at 35.

*Co.*, 978 F.2d 947, 960 (7th Cir.1992) (defendant's use of mark "Thirst Aid" in conjunction with its own mark "Gatorade" in advertising was "precisely the strong association . . . that is likely to cause confusion.").

▮ As stated before, the relevant breed of confusion in this case is confusion as to affiliation, sponsorship, or permission. Tour 18's use of its own mark does little to quell any of these types of confusion. Rather, since consumers encounter plaintiffs' marks frequently in association with the mark TOUR 18 and in conjunction with Tour 18's products, they are likely to believe that plaintiffs are affiliated with Tour 18's activities or that they sponsored or otherwise permitted Tour 18 to copy their holes and use their names in advertisements and written materials. Evidence regarding the number of times plaintiffs' marks appear in conjunction with Tour 18's marks and products supports a finding that consumers are likely to infer some type of affiliation or connection between the parties. For example, in Tour 18's promotional brochure, the HARBOUR TOWN mark appears nine times, the PEBBLE BEACH mark appears six times, and the PINEHURST mark appears seven times. Tour 18 uses plaintiffs' marks to name its golf holes. Tour 18 even uses plaintiffs' service marks to name its restaurant menu items, including "The Pinehurst" sandwich, "Pebble Beach" French Toast, and "The Harbour Town" sandwich. Thus, the evidence compels the conclusion that Tour 18's use of its own name in conjunction with plaintiffs' service marks may aggravate, rather than mitigate, consumer confusion as to affiliation, sponsorship, and/or permission.

Harbour Town uses representations of the lighthouse as a service mark in many brochures, advertisements, soft goods, and other items to designate its services at Harbour Town Golf Links. Tour 18 also uses representations of its replica lighthouse as a service mark in many of its brochures, advertisements, and other written materials. While the replica lighthouse used as a service mark by Tour 18 is smaller than the original and does not have a functioning light, its red and white striping, combined with a shape very similar to that of the original, convince the Court that there is substantial similarity between the two marks.

*(c) Similarity of products and services*

▮ "The greater the similarity between the products and services, the greater the likelihood of confusion." *Exxon Corp.*, 628 F.2d at 505. In this case the "products" and services of the litigants are sufficiently related that consumers are likely to be confused. The similarity of products and services is emphasized by the entire Tour 18 concept and its marketing campaign that is aimed at convincing consumers Tour 18 offers plaintiffs' exact "products" and services at the Tour 18 facility in Humble. Likely consumer confusion is reinforced by Tour 18's advertisements and promotional materials which claim original blueprints and maps were used to copy plaintiffs' holes. It is likely that consumers will mistakenly believe that plaintiffs gave Tour 18 their original blueprints and maps, and in doing so, gave permission to Tour 18 to use them to copy their golf holes. It is true that the parties offer their products in different packages–plaintiffs operate exclusive golf resorts with hotels and restaurants while Tour 18 is a daily fee golf course with no resort facilities. However, the Court finds that these differences are not sufficient to overcome the similarities between the parties' products and services. *Exxon*, 628 F.2d at 505.

*(d) Identity of purchasers and service facilities*

▮ "Dissimilarities between the retail outlets for and the predominant consumers of plaintiff's and defendant's goods lessen the possibility of confusion, mistake, or deception." *Id.* (citation omitted). However, if the parties' goods and services are offered at the same level of distribution and at the same type of facilities, the identity of service facilities factor is met. *Louisiana World Exposition, Inc. v. Logue*, 746 F.2d 1033, 1041 (5th Cir.1984). Tour 18 contends that plaintiffs operate expensive luxury golf resorts that cater more to wealthy tourists than the "weekend hackers" who often play at daily fee courses such as Tour 18. It is true that Tour 18's customers come mainly

from the Houston area since Tour 18 is a public daily fee golf course and not a resort with hotel facilities. However, because of its replica concept and extensive advertising campaign, Tour 18 attracts customers from all over the country. Indeed plaintiffs presented trial testimony from four golfers who had played golf at Tour 18 and also had traveled to play at plaintiffs' golf courses.[30] Thus, the Court finds that there is an identity of purchasers.

### (e) Identity of advertising media

■ The greater the similarity in advertising campaigns, the greater the likelihood of confusion. *Exxon Corp.*, 628 F.2d at 506. The evidence at trial showed that Tour 18 sends promotional brochures with color pictures and descriptions of the Tour 18 concept to potential customers. Tour 18 focuses most of its mailings on customers in Texas and places advertisements in local trade magazines and newspapers such as *Gulf Coast Golfer, Metro Houston Golfer, Shell's Guide to Golf in Houston,* and the *Houston Chronicle*. However, Tour 18 also places advertisements in national golf magazines such as *Golf Digest*. Thus, Tour 18 seeks, to a certain extent, national exposure.

In order to advertise their golf services, plaintiffs send brochures and newsletters to potential customers nationwide, including Houston. Each of the plaintiffs also places advertisements in golf and travel magazines with nationwide circulation. Tour 18 argues, and this Court agrees, that its advertising is regional in nature while plaintiffs advertise on a more nationwide scale. However, even where the parties advertise on different scales, there can still be an identity of advertising media if both parties aim their advertising campaigns at the same region and the same customers. *See Moore Business Forms,* 960 F.2d at 490 (where ad campaigns overlapped such that ads likely would be read by customers of both parties, factor was met); *Exxon Corp.,* 628 F.2d at 506 (although one party's ad campaign was more

national in nature, both parties advertised in Houston area). Here, the evidence shows that the parties advertise to common customers in the Houston area and elsewhere in the nation.

### (f) Tour 18's intent in using plaintiffs' service marks

■ Where a plaintiff can show that a defendant uses its mark with the intent of deriving benefit from the reputation or good will of the plaintiff, that fact alone may be sufficient to justify a finding of confusion. *Blue Bell Bio–Medical v. Cin–Bad, Inc.,* 864 F.2d 1253, 1259 (5th Cir.1989); *Sicilia,* 732 F.2d at 431. In this case, it is undisputed that Tour 18 intentionally copied plaintiffs' golf holes and copied plaintiffs' exact marks for use in its advertisements and golf course signs. Where a party intentionally copies another's trade dress or trademark, a likelihood of confusion may be inferred. *AmBrit, Inc. v. Kraft, Inc.,* 805 F.2d 974, 985 (11th Cir.1986). The rationale for this inference is that there is little if any competitive need to copy the another's valid mark. Thus, where a party copies another's trademark or symbol the law views such actions as an attempt to trade or "cash in" on the goodwill of the competitor that is associated with his mark by attaching the mark to his own goods. *Id.; see* 3 *McCarthy,* § 23.33 ("[W]e can easily read into defendant's choice of a confusingly similar mark the intent to get a free ride upon the reputation of a well known mark."). What is crucial to an inference of likelihood of confusion is evidence of an intent to confuse or deceive as to source or affiliation. This intent to confuse has been characterized as an intent to derive benefit from the goodwill associated with a protectable mark. *See Versa Prods. Co., Inc. v. Bifold Co. (Mfg.) Ltd.,* 50 F.3d 189, 207 (3rd Cir.1995) ("It is not unfair competition to trade off the good will of a product, it is only unfair to deceive consumers as to the origin of one's goods and thereby trade off the good will of a prior

---

**30.** Additionally, while Tour 18 may argue that it attracts customers with less income than plaintiffs' clientele, the evidence showed that Tour 18 is a relatively expensive daily fee golf course when compared to other daily fee courses in

Houston. It therefore attracts wealthier golfers who live in the Houston area and who are more likely to have the financial means to vacation at plaintiffs' golf resorts.

producer"); *Sicilia,* 732 F.2d at 431 ("The proper focus is whether the defendant had the intent to derive benefit from the reputation or goodwill of plaintiff.").

▮ Tour 18 contends no negative inferences should be drawn from its intent to copy plaintiff's golf holes and to use their service marks in advertisements and on the copied golf holes. Specifically, Tour 18 argues that it has the right to use plaintiffs' marks to inform the public about the true origin of its replica golf hole designs. Plaintiffs argue that even assuming *arguendo* Tour 18 may legally copy their hole designs, the manner in which Tour 18 uses their service marks justifies an inference that Tour 18 has intended to trade on their good will and reputations.

At first glance there is some merit to Tour 18's argument that its intent in using plaintiffs' marks is to inform the public which golf holes it copied, and not to trade on plaintiffs' reputations and good will. However, when the Court considers more carefully the evidence regarding the manner in which Tour 18 uses plaintiffs' marks, Tour 18's argument falters. Tour 18 uses plaintiffs' marks prominently and frequently on its promotional brochures and golf course signs. If Tour 18's true intent were to use the marks only as informative devices, it would not, for example, have placed the PINEHURST mark in seven separate places in its promotional brochure. *See Sicilia,* 732 F.2d at 431 (the fact that defendant meant to copy plaintiffs' trade dress "as much as the law would allow" supported finding of intent to benefit from the reputation and good will of the trade dress). Tour 18's "informative use" argument is also belied by its use of the famous names "Masters" and "Amen Corner" in connection with its replicas of Augusta National's 11th, 12th, and 13th golf holes. There is no need for Tour 18 to employ these names to "tell the truth" about the golf holes it copied. Rather, Tour 18 could simply have stated in its promotional materials that it

copied the 11th, 12th, and 13th holes at Augusta National. Instead, Tour 18 uses those names, as well as other nicknames such as the "Lighthouse Hole," "Blue Monster," and "Island Hole," prominently because they contain fame and goodwill valuable to Tour 18's marketing strategy. Also revealing of Tour 18's true intent is its use of plaintiffs' marks in its restaurant menu. Such usage cannot be viewed as merely informative. Rather, it indicates Tour 18's intent in using plaintiffs' service marks has been to cloak itself with as much of the good will and reputation associated with those marks as possible. Therefore, the evidence supports a finding that Tour 18 uses plaintiffs' marks prominently in an attempt to trade on the good will associated with those marks.

### (g) Actual confusion

▮ Evidence of actual confusion caused by a similar mark is not conclusive or required to establish a likelihood of confusion, but it is the best evidence of a likelihood of confusion. *Amstar Corp.,* 615 F.2d at 263. Moreover, "while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof." *Fuji Photo,* 754 F.2d at 597 (quoting *World Carpets, Inc. v. Dick Littrell's New World Carpets,* 438 F.2d 482, 489 (5th Cir.1971)).

▮ To demonstrate actual confusion, plaintiffs called four witnesses and relied on the consumer survey of Dr. Jacob Jacoby. The four witnesses are individuals who played Tour 18 and at least one of plaintiffs' golf courses. All four of the witnesses stated that upon hearing or reading about Tour 18 and its replica concept, but prior to actually playing Tour 18, they assumed Tour 18 had sought and received permission to copy plaintiffs' golf holes and use plaintiffs' names on the copies.[31] Two of the witnesses testified

---

**31.** Examples of the testimony at trial by plaintiffs' "confusion" witnesses are as follows. Jay Miller stated:

> Q: Okay. Now did you make any assumptions as to whether or not there was any connection or affiliation or approval or per-

mission by or between Tour 18 and any of the golf courses?

> A: The information I had gotten was that there wasn't an affiliation. But I felt that, in reading that they had used the original blueprints, that they basically had to have worked with the other courses in order to

1548

that their assumptions regarding permission were based on their own beliefs that the law may have required such permission. However, two of the witnesses stated it was Tour 18's advertising in particular that caused them to believe Tour 18 had permission to replicate the holes. The evidence shows that these two witnesses were confused in great part by Tour 18's advertisements emphasizing plaintiffs' marks and touting the accuracy of their replicas.[32] The mistaken assumptions by these witnesses constitutes persuasive evidence of actual confusion. *See University of Georgia v. Laite*, 756 F.2d at 1546 (holding that several people who falsely assumed defendant had permission to use plaintiff's mark was "persuasive" evidence of actual confusion); *Louisiana World Expo*, 746 F.2d at 1041 (holding one instance of actual confusion sufficient to satisfy actual confusion factor).

In addition to introducing evidence of actual confusion through four live witnesses, plaintiffs introduced a survey conducted by its expert Dr. Jacob Jacoby. Jacoby testified that the purpose of his survey was to determine whether Tour 18's use of plaintiffs'

marks in its promotional materials and signs is likely to confuse golfers into believing that plaintiffs had given Tour 18 permission to copy their holes and use the names of their courses in its promotional materials. Jacoby conducted a phone survey of individuals who played at least one round of golf at Tour 18 and concluded that there is a high level of confusion as to whether plaintiffs gave approval or permission to Tour 18 to copy their golf holes and use their names in promotional materials.

 Tour 18 contends Jacoby used improper survey methods and therefore its results are defective. There are two important factors to be considered in determining the weight to be accorded to the results of a consumer survey: the format of the survey and the methods with which the survey was taken. *Exxon*, 628 F.2d at 506. Tour 18 contends that the universe of Jacoby's survey was improper. "The appropriate universe should include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services." *Amstar*, 615 F.2d at 264.

duplicate the hole. I didn't know any other way they could do something like that without working with them fairly closely.

Q: Did you make any assumptions as to whether or not they had the golf courses' permission or approval by the fact that they were using the names of the courses to identify the holes?

A: I assumed that they absolutely had to have some—either permission or something from then to—to do any of it in the first place.

Q: And why—why wasn't it by using the names that you assumed they had permission?

A: Like anything else, I didn't think that they could use the name or pattern anything exactly as they could without confirmation or permission from the other entity.

Marty Klare stated:

Q: Did you have any assumption as to whether or not Tour 18 had permission to use the name—permission from the owners of Pebble Beach or the other golf courses to use their name to identify their golf hole?

A: That they did have some sort of permission, an agreement to use their names and copy their holes.

Q: And what was the basis of that, sir?

A: My own common sense, right or wrong.

32. Lynne Janis testified:

Q: You didn't believe that Tour 18 was controlled in any way by any of the plaintiffs, is that right?

A: As far as Tour 18 putting together their concept, the only thing I would venture to say is that, when you look at it and—as the course is structured and advertising, I simply thought, well, then, if they're going to have a replica of Pebble Beach, Pinehurst, Augusta, and all the great courses that they did try to replicate, then obviously, the courses needed to put—to maintain that high integrity level in the history and prestige of those courses, that they would actually give criteria—set criteria on how this course has to be—or how that specific hole had to be built. Yes I did assume that Tour 18 had permission.

Paul Schneider testified:

Q: Did you have any impressions one way or the other as to whether Tour 18 had obtained permission from these other golf courses to use their names in connection with its golf course?

A: I assumed, from you know, the advertising that they could play Augusta's Amen Corner and that sort of thing, you know. So I assumed from that they had.

Q: That they had permission to use that name?

A: That they had permission.

Jacoby surveyed 250 people by telephone who played Tour 18 in January and February 1995. Tour 18 contends this universe is improper because it includes only past customers of Tour 18 and not potential customers. Tour 18's arguments are unavailing. First, courts have validated universes with past customers where the purchasers are likely to be repeat customers. *Scotch Whiskey Ass'n v. Consolidated Distilled Products, Inc.*, 210 U.S.P.Q. 639, 641, 1981 WL 40524 (N.D.Ill.1981). Jacoby's survey questioned the actual Tour 18 customers whether they were likely to play Tour 18 again. Ninety percent responded that they were likely to do so; thus Jacoby's universe represents actual as well as potential Tour 18 customers. Furthermore, while *Amstar* approves the use of potential customers, courts have validated surveys based on actual purchasers. *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 533 F.Supp. 75, 81 (S.D.Fla. 1981), *aff'd*, 716 F.2d 854 (1983). Here, the crux of plaintiffs' service mark infringement claim is that Tour 18's advertisements and promotional materials deceive Tour 18 customers into believing that plaintiffs gave their permission to Tour 18 to use their names and golf hole designs. Thus, it was proper for Jacoby to survey actual customers of Tour 18 in order to gauge any confusing effect of Tour 18's use of plaintiffs' marks in its brochures, scorecards, yardage guides, and in particular the signs placed on the Tour 18 golf course. Additionally, the use of actual Tour 18 customers allowed Jacoby to test the effectiveness of Tour 18's disclaimers in its written materials and on its golf course signs. A survey of potential Tour 18 customers might not have achieved the same results with the same efficiency. Thus, since it is actual Tour 18 customers that are more likely to have been exposed to the potentially confusing uses of plaintiffs' service marks, a universe including those golfers is appropriate. The Court finds that Jacoby's survey included a proper universe.

According to the survey evidence submitted by plaintiffs, out of a total sample of 235 Tour 18 golfers, at least fifteen percent believe Tour 18 obtained permission and approval from Pebble Beach and Pinehurst to use their service marks in advertisements and to name their individual golf holes.[33] The survey also proposes that at least seventeen percent of the 235 golfers believe that Tour 18 obtained permission and approval from plaintiffs to copy their golf hole designs. After considering the survey as a whole, the Court finds the evidence of confusion as to approval and permission credible and probative of actual confusion.

The Jacoby survey consisted of one main questionnaire. One section of the questionnaire, the Question 7 series, was designed to assess whether, and if so to what extent, there is confusion as to sponsorship or permission by golfers who have played Tour 18. The Question 7 series posed the following questions:

7a. Tour 18 advertises it has copied 18 of America's most famous golf holes from different courses. Do you think the owner of Tour 18 . . .

1. did get permission from the owners of these other courses to copy their holes,

2. did not get permission from the owners of these other courses to copy their holes,

3. or you don't have any idea about this?

4. DON'T KNOW.

7c. Tour 18 also uses the names of these other golf courses to advertise its holes and course to the public. Do you think the owner of Tour 18 . . .

1. did get permission from the owners of these other courses to use their names at Tour 18 and to advertise Tour 18 to the public,

2. did not get permission from the owners of these other courses to use their

---

**33.** The Court notes that the Jacoby survey only analyzed actual confusion generated by Tour 18's use of Pebble Beach's and Pinehurst's marks and golf hole designs. Since Sea Pines had not yet joined the lawsuit at the time of the Jacoby survey, the survey did not include Harbour Town Golf Links. However, the Court has no reason to believe the results of the Jacoby survey showing evidence of actual confusion would be different if Harbour Town had been included.

names at Tour 18 and to advertise Tour 18 to the public,

3. or you don't have any idea about this?

4. DON'T KNOW.

These questions were followed by a "control" question designed to assess guessing or "noise." [34] Furthermore, while Tour 18 argues that the above questions are leading, the Court finds that the survey properly accounted for the possibility that the questions are leading. Specifically, to minimize "order bias" and leading questions, the questions above were rotated so that approximately half of the respondents were initially asked "did get permission," and the other half were first asked the "did not get permission" question. The presence of a "don't know" option lends additional validity to the survey results.

The Jacoby survey also contained a question asking if the respondent was aware of the instant lawsuit between Tour 18 and plaintiffs. Clearly respondents aware of the instant dispute at the time of the survey could not objectively answer the questions. When the Court excludes those aware of the instant suit, the percentage of confused golfers is higher than the initial fifteen to seventeen percent. Specifically, of the thirty-five respondents who had not heard of the instant lawsuit, forty percent were confused into believing that the owners of Tour 18 had obtained permission from the Pebble Beach and Pinehurst to copy their golf hole designs. Furthermore, twenty-nine percent of those unaware of the dispute were confused into believing that plaintiffs gave Tour 18 permission to use their marks in advertising and to

name their golf holes. Other courts have accepted similar survey results as evidence of actual confusion as to sponsorship or affiliation. *See Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 400 (8th Cir.1987) ("approximately ten percent of all the persons surveyed thought that Mutual 'goes along' with Novak's product."). The Court finds that the Jacoby survey constitutes reliable evidence of actual confusion. This survey, in combination with plaintiffs' four actual confusion witnesses, is substantial evidence in favor of plaintiffs on the likelihood of confusion issue.

*(h) Tour 18's disclaimers*

The Court's examination of the various likelihood of confusion factors indicates that consumers are likely to be confused by Tour 18's uses of plaintiffs' marks. However, the Court's analysis is not complete until it considers the effect of Tour 18's disclaimers and whether they reduce consumer confusion.

■ Disclaimers that emphasize the source of a product or services or that disclaim affiliation can reduce or eliminate a minimal likelihood of confusion. *See August Storck K.G. v. Nabisco, Inc.*, 59 F.3d 616, 618–19 (7th Cir.1995); *Soltex Polymer Corporation v. Fortex Industries, Inc.*, 832 F.2d 1325, 1330 (2d Cir.1987). However, the mere presence of a disclaimer does not necessarily prevent consumer confusion.[35] Obviously the use of an obscure or inconspicuous disclaimer will not be sufficient to reduce confusion. *See Anheuser–Busch*, 28 F.3d at 774 (obscure disclaimer was insufficient to quell confusion as to permission that was generated by parody of trademark in humor magazine); *Uni-*

---

**34.** The "control question asked,
 7g. What about calling itself Tour 18? Do you think that the owner of Tour 18 contacted other golf courses in Houston and ...
 1. did get permission from the owners of these other Houston courses to call itself Tour 18,
 2. did not get permission from the owners of these other Houston courses to call itself Tour 18,
 3. or you don't have any idea about this?
 4. DON'T KNOW.

**35.** The Court notes that Tour 18's voluntary act of placing disclaimers in its promotional brochures and on its golf course signs amounts, in

this Court's view, to an acknowledgment that its use of plaintiffs' marks in conjunction with its replica golf holes is likely to cause confusion among consumers. *See Conopco, Inc. v. May Dept. Stores Co.*, 784 F.Supp. 648, 683 (E.D.Mo. 1992) (party's voluntary act of placing disclaimer on packaging was "tacit admission" that the use of owner's mark would cause confusion). Indeed some courts have viewed a defendant's voluntary use of disclaimers as "a calculated effort by defendants to escape liability for infringement." *Id.; see International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1093 and n. 9 (7th Cir.1988).

*versity of Georgia v. Laite*, 756 F.2d at 1547 (placement of disclaimer on can of novelty beer stating that the beer was not associated with the plaintiff's mark was insufficient to remedy confusion). Additionally, some courts have placed the burden on the defendant to provide evidence establishing that its disclaimers are effective. *Charles of the Ritz Group v. Quality King Distributors*, 832 F.2d 1317, 1324 (2d Cir.1987); *Home Box Office v. Showtime/The Movie Channel*, 832 F.2d 1311, 1315 (2d Cir.1987). With these considerations in mind, the court must assess the content, size, and location of the Tour 18 disclaimers as compared to the overall advertisement or sign within which plaintiffs' marks appear.

■ The disclaimers used by Tour 18 can be divided into two categories: disclaimers placed in their brochures and advertisements; and disclaimers attached to the tee box signs on the Tour 18 golf course. First, the Court notes that Tour 18 did not present any evidence, empirical or otherwise, to indicate that their disclaimers are effective. The Court finds that the inconspicuous disclaimers (or lack thereof) in Tour 18's written brochures and advertisements do not eliminate the confusion generated by the Tour 18's uses of plaintiffs' service marks. First, plaintiffs' marks appear numerous times on four separate pages in both versions of the Tour 18 promotional brochure. The Tour 18 disclaimer appears only once at the bottom of the last page in small black type. The Tour 18 yardage guide consists of twenty-two pages describing each of the Tour 18 replica golf holes. Disclaimers appear only at the bottom of the second and eleventh pages and only in minuscule print. The Tour 18 scorecard also has a disclaimer in very small italic print at the bottom of the second page.

Additionally, the evidence indicates that not only do Tour 18's promotional brochures, scorecard, and yardage guide contain small,

obscured disclaimers, but the majority of their advertisements do not contain any disclaimer. For example, a Tour 18 mailer that contains a prominent picture of Tour 18's version of the "Lighthouse Hole" and the mark HARBOUR TOWN GOLF LINKS, as well as other prominent uses of all three plaintiffs' marks, does not contain a disclaimer. (PX 102). Tour 18's advertisement in the Fall 1994 issue of *Metro Houston Golfer* magazine consists of a two page layout describing the Tour 18 concept and prominently features plaintiffs' marks. (PX 116). A picture of the Tour 18 replica lighthouse appears on the front cover of the magazine and in the Tour 18 advertisement inside. There is no disclaimer of any sort in the magazine. The absence of a disclaimer on the Tour 18 press release is also of concern to the Court since the press release contains statements that are especially apt to cause confusion as to affiliation or permission. The press release states, for example, "Fort Worth's own Colonial Country Club contributes its No. 3 for Tour 18's 12th Hole," and "Long Island's Shinnecock Hills gives Tour 18 hole 15 modeled after its own No. 8." Tour 18 advertisements in the "Shell Houston Golf Guide–Greater Houston" and the *Houston Chronicle* also appear without disclaimers. Finally, the Tour 18 restaurant menu has no disclaimer attached. Therefore, the Court finds that because of the diminutive size and obscure location of the disclaimers in Tour 18's promotional materials, as well as the complete lack of disclaimers in many advertisements, do not eliminate the misleading impression generated by Tour 18's prominent use of plaintiffs' marks. *See Charles of the Ritz Group*, 832 F.2d at 1324 (where perfume imitator's packaging used plaintiff's exact mark for comparative advertising purposes, court held that disclaimer in smaller type and in less prominent position was inadequate to obviate consumer confusion).[36]

---

**36.** The ineffectiveness of Tour 18's disclaimers was confirmed by two of plaintiffs' marketing experts. Gabriel Gelb, plaintiffs' expert in the field of marketing research, testified that the Tour 18 disclaimers on .its promotional brochures are ineffective at reducing confusion generated by Tour 18's prominent use of plaintiffs' marks. Gelb reasoned that even if consumers

read the Tour 18 disclaimers, they are a mere "afterthought" that is lost on consumers when they encounter Tour 18's prominent use of and emphasis on plaintiffs' marks. (Tr. at 1465).

The Court's finding that Tour 18's written disclaimers are ineffective at reducing confusion is also supported by the Jacoby survey. The Court first notes that Jacoby is one of the leading

■■■■ The second category of disclaimers, those attached to the Tour 18 tee box signs, are placed more conspicuously and prominently than the disclaimers in Tour 18's advertisements and promotional brochures. Since the tee box signs describe the layout of the hole the golfer is about to play, it is likely that golfers will read the signs and the attached disclaimers before playing the golf holes. However, even if the Court assumes that the signs on the Tour 18 golf course are effective at reducing confusion for golfers who read them, a finding of likelihood of confusion is still warranted. Specifically, the Lanham Act is violated whenever there is confusion in the buying process, *Marathon Mfg. Co. v. Enerlite Products Corp.*, 767 F.2d 214, 220–21 (5th Cir.1985); *Joy Mfg. Co. v. CGM Valve & Gauge Co., Inc.*, 730 F.Supp. 1387, 1394 (S.D.Tex.1989). This is still true even if the purchaser's confusion is later dispelled through use or familiarization with the product. Here, golfers are likely to be confused after viewing Tour 18's advertisements and brochures but prior to playing the course. Thus, Tour 18 cannot avoid liability by contending that confusion is dispelled by reading disclaimers at the course. At that point, Tour 18 has already reaped the benefits of any customer confusion. *See Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir.1987) (likelihood that defendant would gain "crucial credibility" during initial phase of purchase justified finding of infringement).

### (i). Weighing the factors

Based upon the foregoing review of the likelihood of confusion factors, this Court finds that plaintiffs' service marks are strong and entitled to wide protection; that Tour 18 uses and displays plaintiffs' exact marks prominently and frequently in its advertisements and on its golf course; that the products and services of the parties are very similar; that the parties have common customers; that there is some similarity and overlap in the parties' advertising campaigns; that Tour 18's prominent usage of plaintiffs' marks in its advertising and promotional campaign is evidence of an intent to trade upon the reputation and good will of plaintiffs and their marks; that a sufficient number of golfers are actually confused by Tour 18's prominent use of plaintiffs' service marks; and that the disclaimers in Tour 18's advertisements, promotional brochures, and golf course signs, as currently written and placed, are not sufficient to quell consumer confusion.

### C. Comparative Advertising/Fair Use Defense

■■■■ Tour 18 argues that its use of plaintiffs' marks is a "fair use" in that it does not use plaintiffs' marks as service marks, but only to describe plaintiffs' golf holes in comparative advertising. A party's use of another's trade or service mark is not *per se* unlawful. *Calvin Klein Cosmetics Corp. v. Lenox Laboratories, Inc.*, 815 F.2d 500, 503 (8th Cir.1987). For example, in *Saxlehner v. Wagner*, the Supreme Court ruled that where an imitator lawfully copies another's product, the law allows the imitator to use the originator's trade mark or service mark to inform the public of the source of the copy. 216 U.S. 375, 376, 30 S.Ct. 298, 298, 54 L.Ed. 525 (1910). Consistent with this theory, "[t]he use of a competitor's trademark for purposes of comparative advertising is not trademark infringement so long as it does not contain misrepresentations or create a

experts in the field of consumer disclaimers. His treatise, Jacoby & Raskoff, *Disclaimers as a Remedy for Trademark Infringement Litigation: More Trouble than they are Worth?*, 76 Trademark Rept. 35 (1986), has been relied upon by many courts facing the issue of consumer disclaimers. *See Charles of the Ritz Group*, 832 F.2d at 1324; *Home Box Office*, 832 F.2d at 1315.

In this case, one section of the Jacoby survey asked respondents whether they had "ever looked through a Tour 18 advertising or promotional brochure?" Jacoby's survey found that an overwhelming majority (168 out of 235, or

70%) of the Tour 18 golfers who were surveyed had read through the Tour 18 brochure. However, according to the survey results, many of them, despite having read through the brochures, stated in the Question 7 series that they believed Tour 18 had received permission from plaintiffs to use their marks and copy their golf holes. Thus, the calculations of the Jacoby survey confirm this Court finding that the Tour 18 disclaimers are insufficient to overcome Tour 18's emphasis on plaintiffs' marks and its replica concept in its advertising and promotional brochures.

reasonable likelihood that consumers will be confused as to the source, identity, or sponsorship of the advertiser's product." *G.D. Searle & Co. v. Hudson Pharmaceutical Corp.*, 715 F.2d 837, 841 (3d Cir.1983) (citation omitted); *Hypertherm v. Precision Products, Inc.*, 832 F.2d 697 (1st Cir.1987) (copier may use originator's trademark descriptively in advertising to identify the product it has copied so long as no confusion as to source results); *Smith v. Chanel*, 402 F.2d 562, 569 (9th Cir.1968) ("in the absence of misrepresentation or confusion as to source or sponsorship, a seller in promoting his goods may use the trademark of another to identify the latter's goods."). The rationale underlying the theory is that the alleged infringer uses another's mark only to describe and refer to the originator's products in an effort to compare or equate them to its copies, and does not appropriate the mark for use as a trademark to identify its own products.[37] However, where the use of another's mark, even in comparative advertising, creates a likelihood of confusion among consumers as to source, affiliation, or sponsorship, no fair use defense is available. *Hypertherm*, 832 F.2d at 700; *Zatarains*, 698 F.2d at 791; *Cullman Ventures, Inc. v. Columbian Art Works, Inc.*, 717 F.Supp. 96, 134 (S.D.N.Y.1989).

▄▄▄ Tour 18's comparative advertising defense fails. First, the Court held above that Tour 18's prominent use of plaintiffs' exact service marks creates a likelihood of confusion among golfers; thus, no fair use defense is available. Second, Tour 18's use of plaintiffs' marks is not merely a descriptive use that is limited to comparative advertising. Rather, the evidence of Tour 18's various advertisements and written materials support a finding that Tour 18 uses plaintiffs' marks as service marks. Specifically, Tour 18 uses plaintiffs' marks to name its own products–its individual golf holes. Tour 18 therefore uses the marks to identify its golf holes and distinguish Tour 18's services from the services offered by other golf courses. As a matter of law, such usage constitutes service mark usage, and precludes Tour 18's reliance on a fair use/comparative advertising defense. *See Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 953–54 (7th Cir.1992) (prominent use of plaintiffs' mark as attention-getting device was not descriptive use but was trademark use); *Lindy Pen*, 725 F.2d at 1248 (defendant's use of plaintiff's exact mark on its goods was trademark use, not fair use within comparative advertising); *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 938 (10th Cir.1983) (no fair use where defendant used "Brew Nuts" as a "secondary trademark" along with its own brand name on packaging). While Tour 18's original intent may have been to use plaintiffs' marks only to describe to consumers what they copied, the evidence shows that they have gone beyond merely descriptive uses of plaintiffs' marks. In the process Tour 18 has "cut too close to the bone" and committed service mark infringement. *See Hypertherm*, 832 F.2d at 701 (company that replicated plaintiff's replacement parts and used plaintiffs' service marks in advertisements went beyond permissible uses of another's mark for comparative advertising). In sum, Tour 18's fair use/comparative advertising defense is belied by its extensive placement of and emphasis on plaintiffs' marks in its brochures, signs, advertisements, menu, and scorecards as a means of distinguishing its goods and services from others.

---

**37.** The "comparative advertising" defense that Tour 18 asserts and that other courts have used appears to this Court to be a species of the "fair use" defense. One of the permissible defenses to a claim of service mark infringement is that a party's use of another's mark constitutes "fair use." 15 U.S.C. § 1115(b)(4); *Soweco*, 617 F.2d at 1185. This defense is available where a defendant can show that its use of the term: (1) is not as a service mark; (2) is descriptive of the services it provides; and (3) is fair and in good faith. *Id.*

Tour 18 argued at trial that this Court should not apply the fair use principles to their comparative advertising defense. It is clear that the fair use test is no help to Tour 18 since it only applies to descriptive terms and only where the term is used in its original descriptive, rather than its trademark sense. *Zatarains*, 698 F.2d at 796. Here, plaintiffs' marks are not descriptive and therefore the fair use test is inapplicable. Nevertheless, the comparative advertising defense is, as Tour 18 acknowledged in its closing argument, analogous to the fair use defense since under both theories the alleged infringer must show that its use of the relevant mark is other than a trade or service mark use.

■ Therefore, the Court finds that plaintiffs have shown that their marks PEBBLE BEACH, PINEHURST, HARBOUR TOWN, and the lighthouse at Harbour Town are valid; that defendants, without plaintiffs' consent, used in commerce reproductions, counterfeits, copies and colorable imitations of plaintiffs' registered marks; and that Tour 18's use of plaintiffs' marks is likely to cause confusion as to affiliation, sponsorship, and/or permission. Accordingly, the Court finds in favor of plaintiffs on their Lanham Act service mark infringement claims.

## UNFAIR COMPETITION

■ The same facts which support an action for service mark infringement also support claims for common law and Lanham Act unfair competition. Thus, liability for unfair competition, like liability for service mark infringement, depends on likelihood of confusion. *McCoy v. Mitsuboshi Cutlery, Inc.,* 67 F.3d 917, 923 (Fed.Cir.1995); *Marathon Mfg. Co.,* 767 F.2d at 217. As the Court found above that Tour 18's use of the marks PEBBLE BEACH, HARBOUR TOWN, PINEHURST, and the lighthouse are likely to cause confusion as to permission and sponsorship, Tour 18 is likewise liable for common law unfair competition and unfair competition under section 43(a).

## TRADE DRESS INFRINGEMENT

Plaintiffs contend that Tour 18's replication of their golf holes and the Harbour Town lighthouse constitutes trade dress infringement and unfair competition in violation of section 43(a) of the Lanham Act. 15 U.S.C. § 1125(a).

Initially the Court addresses Tour 18's argument that it may freely copy plaintiffs' designs because they are not protected by patent. In support of its argument, Tour 18 relies on the Supreme Court's decisions in *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964) and *Compco v. Day–Brite Lighting, Inc.,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964). These cases hold that state unfair competition laws cannot grant patent protection to otherwise unprotected product designs because such protection would conflict with federal policy in favor of free competition. *See Bonito Boats v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 152–55, 109 S.Ct. 971, 978–79, 103 L.Ed.2d 118 (1989) (interpreting *Sears* and *Compco* ). However, the Supreme Court in *Compco* stated that a defendant can copy a product at will only if the design is "not entitled to a design patent *or other federal statutory protection . . . ." Compco,* 376 U.S. at 238, 84 S.Ct. at 782 (emphasis added). The Lanham Act falls within "other statutory protection" and therefore courts have expressly held that *Sears* and *Compco* do not preclude federal trademark and trade dress protection of product designs. *Kohler v. Moen,* 12 F.3d 632, 640 (7th Cir.1993); *Esercizio v. Roberts,* 944 F.2d 1235, 1239 (6th Cir.1991); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 204 (2d Cir.1979). Therefore, contrary to Tour 18's claim that *Sears* and *Compco* give it a fundamental right to copy plaintiffs' unpatented designs, the decisions do not impact the use of the Lanham Act to protect trade dress of a product design where the trade dress acts as an indicator of source and confusion is present. If plaintiffs make the requisite showings of nonfunctionality, distinctiveness, and likelihood of confusion, the Lanham Act precludes copying of their trade dresses.

■ The protection against trademark infringement provided by section 43(a) of the Lanham Act is not limited to protection of trademarks, but extends to the unregistered "trade dress" of an item where the dress meets certain requirements. *Blue Bell Bio–Medical,* 864 F.2d at 1256. "Trade dress" refers to the image and overall appearance of a product, including size, shape, color, or color combinations. *Id.* "It embodies 'that arrangement of identifying characteristics or decorations connected to a product, whether by packaging or otherwise, intended to make the source of the product distinguishable from another and to promote its sale.' " *Esercizio v. Roberts,* 944 F.2d at 1239 (citation omitted). Additionally, while "trade dress" originally referred to the packaging or displays associated with a product, the design or appearance of a product itself may function as its packaging or trade dress

and enjoy protection under the Lanham Act. *Duraco Products Inc. v. Joy Plastic Enterprises, Ltd.,* 40 F.3d 1431, 1438 (3d Cir.1994). The trade dresses at issue in this case include the shapes of plaintiffs' golf holes, the length and width of the holes, the placement and shape of sand and water hazards, the size and shape of the greens, the slope and elevation of the holes, and the golf holes' surrounding vegetation. In addition, Harbour Town asserts as part of its trade dress the design and appearance of the red and white striped lighthouse.

■■■■ A trade dress infringement claim requires a two-step analysis. The Court must first determine whether plaintiffs' trade dresses qualify for protection. This determination depends on three issues: (1) distinctiveness, (2) secondary meaning, and (3) functionality. If plaintiffs' trade dresses are protectable, the Court must then determine whether there is infringement. Infringement occurs only when there is a likelihood of confusion between the products or services of the plaintiff and defendant. *Blue Bell Bio–Medical,* 864 F.2d at 1256.

A. Functionality

■■■■ The functionality doctrine acts to prevent any one party from monopolizing as its trademark a product feature or design that serves a primarily utilitarian rather than identifying purpose. Functional trade dress (which is essential to the product's utility as opposed to merely identifying the product) is not protectable under the Lanham Act. *Sicilia,* 732 F.2d at 425.[38]

In *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* the Supreme Court defined a functional feature or design in "general terms" as one that "is essential to the use or purpose of the article or [that] affects the

cost or quality of the article." 456 U.S. 844, 850–51 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606 (1982). The Supreme Court then elaborated on that definition in *Qualitex Co. v. Jacobson Products Co., Inc.,* holding that a determination of functionality depends on (1) whether a product design or feature is essential to the use or purpose of the article and (2) whether the plaintiff's exclusive use of the design would inhibit competition. —— U.S. ——, ——; 115 S.Ct. 1300, 1304, 131 L.Ed.2d 248 (1995). The Fifth Circuit followed a similar standard in *Sicilia* stating, "unless the design is only one of a limited number of equally efficient options and free competition would be unduly hindered by according that design trademark protection," it is nonfunctional as a matter of law. *Sicilia,* 732 F.2d at 429.

■■■■ Tour 18 argues that the designs of plaintiffs' golf holes are arrangements of purely functional features and are therefore functional designs. In support of its argument, Tour 18 points to trial testimony indicating that each of the design elements of plaintiffs' golf holes affects the manner in which golf is played on the individual golf holes. By emphasizing the functional nature of the individual features of plaintiffs' trade dresses, Tour 18 focuses on the wrong inquiry. Plaintiffs do not seek trade dress protection in all golf holes containing, for example, large frontal bunkers or natural areas. Rather, they claim as their identifying marks the particular combinations and arrangements of features that comprise their overall golf hole designs. "Whether the configuration of [an article] is functional or can receive trademark protection depends on whether its design *as a whole* is superior to other designs, not on whether its component features viewed individually each have a function."

---

38. At the outset, the Court notes that the burden of proof on the question of functionality is an issue of first impression in the Fifth Circuit. Moreover, there is a split among the circuits as to whether (1) the plaintiffs have the burden of proving their trade dresses are nonfunctional, or (2) the defendant must prove plaintiffs' trade dresses are functional. In a recent copyright infringement case, this Court ruled that the burden of proving nonfunctionality of a product feature lies with the party bringing the infringement action. *Compaq Computer Corporation v.*

*Procom Technology, Inc.,* 908 F.Supp. 1409, 1423 (S.D.Tex.1995) (citing *Sega Enterprises Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1531 (9th Cir. 1992)). Furthermore, as Professor McCarthy noted, "A growing number of courts take the view that in infringement litigation, plaintiff has the burden of proving nonfunctionality of its asserted trademark or trade dress." 1 McCarthy § 7.26[3][d] (citations omitted). Therefore the Court finds that the burden is on plaintiffs to prove that their trade dresses are nonfunctional.

*Vaughan Mfg. Co. v. Brikam Intern., Inc.,* 814 F.2d 346, 350 (7th Cir.1987) (emphasis added). Furthermore, it is well established that "a particular arbitrary combination of functional features, the combination of which is not itself functional, properly enjoys protection." *Taco Cabana Int'l,* 932 F.2d at 1119. Thus, the relevant inquiry is whether plaintiffs' golf holes, when viewed in their entirety, are nonfunctional.

 After considering the overall combination of features that make up plaintiffs' trade dresses, the Court finds that they are nonfunctional. The evidence in this case indicates that there is an unlimited number of alternative designs to plaintiffs' golf hole configurations. Additionally, while plaintiffs' designs are particularly beautiful and challenging, there is no evidence to indicate that the designs are superior to the many available alternatives. Consequently, there was no need for Tour 18 to copy plaintiffs' golf hole designs to achieve the functions of a golf hole. *See Id.* ("multitude" of other designs for decor of Mexican restaurant supported finding of nonfunctionality); *Sicilia,* 732 F.2d at 429 (existence of vast number of forms of juice bottles required finding that particular design was nonfunctional).

The Court's finding of nonfunctionality is reinforced when the Court considers the rationale behind the doctrine: "encouraging competition by preventing advances in functional design from being monopolized." *LeSportsac, Inc. v. K Mart Corp.,* 754 F.2d 71, 77 (2d Cir.1985). The evidence in the instant case conclusively shows that competition would not be unduly injured should this Court grant Lanham Act protection to plaintiffs' trade dresses. Specifically, Rick Forester, one of Tour 18's golf experts and the owner of another public golf course in the Houston area, testified at trial that protecting the design of plaintiffs' golf holes would not unduly injure competition. Barron Jacobsen, Tour 18's Director of Marketing, also testified at trial that it is not necessary for a golf course to copy plaintiffs' golf hole designs in order to be competitive in the Houston golf course market. This testimony, in combination with the evidence of unlimited alternative designs, establishes that precluding other golf course companies from replicating plaintiffs' golf holes would not give plaintiffs an unfair competitive advantage. Thus, the Court finds that the configuration of plaintiffs' golf holes, when considered in their entirety, are nonfunctional.

### B. Inherent Distinctiveness

 Trade dress that is nonfunctional qualifies for protection under the Lanham Act if it is either (1) inherently distinctive or (2) has acquired distinctiveness through secondary meaning. *Taco Cabana,* 505 U.S. at 768–69, 112 S.Ct. at 2757. Trade dress that meets those requirements is protectable because the law presumes that it acts as a trademark by distinguishing the trade dress owner's goods from the competition's and identifying the owner as the source of the goods. *Id.*

 Trade dress is inherently distinctive if its "intrinsic nature serves to identify a particular source of a product." *Id.* Additionally, the Fifth Circuit in *Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.* stated that trade dress is inherently distinctive if "the features of the trade dress sought to be protected are arbitrary and serve no function either to describe the product or assist in its effective packaging." 659 F.2d 695, 702 (5th Cir.Unit A Oct. 1981).

 In determining whether trade dress is inherently distinctive the Court uses the same framework used to analyze the distinctiveness of plaintiffs' service marks. Specifically, trade dress may be (1) fanciful; (2) arbitrary; (3) suggestive; (4) descriptive; or (5) generic.[39] Tour 18 argues that plain-

---

**39.** This case represents the unusual situation where a plaintiff seeks trade dress protection for the design of a product itself rather than the product's packaging. Recently, some courts have expressed disapproval over the application of the *Abercrombie* classifications to product configuration trade dress. *See e.g., Duraco Products,* 40 F.3d at 1440; *Mulberry Thai Silks, Inc. v. K & K Neckwear, Inc.,* 897 F.Supp. 789, 793 (S.D.N.Y. 1995). In *Duraco,* the court went so far as to create a new test for determining distinctiveness of trade dress when the dress sought to be protected is a product rather than a product's packaging. *Duraco,* 40 F.3d at 1448–51. The *Duraco*

tiffs' trade dresses are descriptive and therefore protectable only on a showing of secondary meaning. Trade dress is descriptive if it " 'identifies a characteristic or quality of an article or service' ... such as its color, odor, function, dimensions, or ingredients." *Zatarains*, 698 F.2d at 792 (citation omitted). Furthermore, if the design of the trade dress is closely intertwined with the product itself, then the trade dress is descriptive. *Stuart Hall Co., Inc. v. Ampad Corp.*, 51 F.3d 780, 786 (8th Cir.1995).

▇▇▇ Plaintiffs argue that the trade dresses of their golf holes are arbitrary or at least suggestive and therefore inherently distinctive. To support their argument, plaintiffs presented evidence at trial indicating that there is an unlimited number of golf hole designs available for new golf holes since all that is necessary for a golf hole is a teeing area, a green, a hole in the green, and some distance between the tee and green. Plaintiffs also presented evidence that aside from Tour 18's replicas, no other golf holes are identical to their golf holes. Such evidence, plaintiffs argue, establishes that their trade dresses are inherently distinctive. This Court is unpersuaded by Plaintiffs' argument. Merely because no other golf holes resemble or are designed exactly like plaintiffs' does not make the holes inherently distinctive. Such a finding would "eviscerate the requirement for showing secondary meaning." *Duraco*, 40 F.3d at 1447. *See*

*Turtle Wax, Inc. v. First Brands Corp.*, 781 F.Supp. 1314, 1321 (N.D.Ill.1991);[40] 1 McCarthy § 8.02[4] ("It is erroneous to find a product or packaging feature "inherently distinctive" merely because it is not *identical* to features commonly found in the marketplace. A product or package feature is not inherently distinctive merely because there is no other product on the market that looks exactly the same."). The requirement that a party show secondary meaning ensures that a product feature is viewed by consumers as an indicator of source and thus acts as a trademark. If courts were to presume that a product acts as an identifier of source merely because it is different from others, there would never be a need to apply secondary meaning whenever a different product or feature enters the market.

The designs of Pebble Beach Hole 14 and Pinehurst No. 2 Hole 3 are not arbitrary and distinctive as compared to other golf holes such that the designs automatically serve as identifiers of source. *See EFS Marketing, Inc. v. Russ Berrie & Co., Inc.*, 836 F.Supp. 128, 135 (S.D.N.Y.1993), *rev'd and vacated in part on other grounds*, 76 F.3d 487 (2d Cir. 1996) (citing *Two Pesos*, 505 U.S. at 768, 112 S.Ct. at 2757) (trade dress that merely "refers to the genus of which the particular product is a species" is not inherently distinctive). When one considers these two golf holes, there are very few distinctive features. Pebble Beach relies on the large frontal

test creates a more stringent standard of distinctiveness to be applied to a product before it will be protectable absent secondary meaning. *Id.*

The Fifth Circuit has not addressed the *Duraco* method for determining distinctiveness of trade dress for product configurations. In *Taco Cabana Int'l*, the Fifth Circuit followed the classic *Abercrombie* terminology to determine that the trade dress of a Mexican restaurant was inherently distinctive. 932 F.2d at 1119–20. Significantly, in affirming the Fifth Circuit's ruling in *Taco Cabana Int'l*, the Supreme Court stated that the Fifth Circuit was "quite right" in following the *Abercrombie* classifications to determine whether trade dress for which protection is sought under section 43(a) is inherently distinctive. *Taco Cabana*, 505 U.S. at 773, 112 S.Ct. at 2760.

This is not to say that the Fifth Circuit has never distinguished between product packaging and the product itself in trade dress infringement analysis. In *Sicilia*, the Fifth Circuit stated in

dicta, "Unlike a product's configuration, which may acquire trademark value over time, and by exposure to consumers, arbitrary and nonutilitarian trade dress or packaging usually is designed to act immediately as an identifier of source." *Sicilia*, 732 F.2d at 426 n. 7. This Court finds that there is merit in *Sicilia*'s distinction and *Duraco*'s heightened standard for assessing the inherent distinctiveness of product configurations. However, based on the Supreme Court's discussion in *Taco Cabana*, this Court will apply the *Abercrombie* classifications.

**40.** The Court in *Turtle Wax* stated: "Presumably it could also be said about the trade dress of any new product that no competitive product combines precisely the same elements in its trade dress.... However, that fact alone does not make the product's trade dress inherently distinctive. Any other rule essentially would require a finding of inherent distinctiveness whenever a new product enters the market." *Turtle Wax*, 781 F.Supp. at 1314.

bunker guarding the left side of the green as the distinctive feature of its 14th Hole. Resorts points to the natural area along the right side of the fairway as being distinctive. However, at best these features reflect a "variation on a commonplace theme" and do not establish that the golf holes are so arbitrary that "one can assume without proof that [the trade dress] automatically will be perceived . . . as an identifier of the source of the product." *Mulberry Thai Silks*, 897 F.Supp. at 794. Indeed these allegedly arbitrary features are included in many other golf holes, including other golf holes on plaintiffs' own courses, albeit in slightly different shapes and sizes. The designs of Pebble Beach Hole 14 and Pinehurst No. 2 Hole 3 are therefore only variations on common designs already prevalent in the golf course industry. *See EFS Marketing*, 76 F.3d at 491 (design of dolls similar to many other designs on the market did not serve as designator of source and therefore was not protectable); *Brooks Shoe Mfg.*, 716 F.2d at 857 ("V"-shaped design on sports shoe held not sufficiently distinctive since it was variation on common theme in shoe industry); *Seabrook Foods, Inc. v. Bar–Well Foods Ltd.*, 568 F.2d 1342, 1344 (C.C.P.A.1977) (package design which was variation on design frequently used in field was not inherently distinctive).

 Alternatively, plaintiffs argue that the trade dresses of their golf holes are suggestive and therefore inherently distinctive. The distinction between suggestive and descriptive trademarks was outlined in *Abercrombie*: "A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods." 537 F.2d at 11 (citation omitted); *see Soweco*, 617 F.2d at

1183. In the context of this case, the Court finds that the designs of Pebble Beach Hole 14 and Pinehurst No. 2 Hole 3 are not suggestive of plaintiffs as their source. There is no evidence before the Court to indicate that these designs "suggest" anything to consumers other than that they are golf holes. Plaintiffs contend that their trade dresses are suggestive because when a golfer encounters their golf holes, he must use imagination and perception to understand the trade dress of each hole. This Court disagrees. When a golfer encounters the trade dress of Pebble Beach Hole 14, mere observation compels the conclusion that it is a dog-leg right golf hole with large cypress trees on the right side of the fairway, a steep incline preceding the green, and a large bunker guarding the left side of the green. Additionally, observation of Pinehurst No. 2 Hole 3 suggests to golfers only that it is a dog leg right golf hole with a large natural area on the right and numerous bunkers surrounding the green. These golf holes do not suggest anything about their sources. Therefore, the Court finds that Pebble Beach Hole 14 and Pinehurst No. 2 Hole 3 are descriptive and are protectable only upon a showing of secondary meaning.[41]

 This is not to say that a golf hole could never be sufficiently distinctive to be protectable absent secondary meaning. Harbour Town Hole 18, because of its association with and incorporation of the lighthouse, contains arbitrary source-identifying features that make its design inherently distinctive. First, the inclusion of a lighthouse as a feature in a golf hole's trade dress is, unlike a sand or water hazard, completely arbitrary and uncommon as compared to other golf holes. Additionally, the fact that the lighthouse can be used as a target for golfers is an additional feature that is arbitrary, uncommon, and that creates a distinctive identi-

---

**41.** The Court notes that it is not inconsistent to find Pebble Beach Hole 14 and Pinehurst No. 2 Hole 3 nonfunctional and yet not inherently distinctive. As the Fifth Circuit in *Sno–Wizard Mfg. v. Eisemann Prods. Co.* stated, "It does not necessarily follow that a design cannot be termed non-functional and non-distinctive. A product's design could be found non-optimal and thus 'non-functional' and still be considered helpful to the product's utility and not a fanciful or arbitrary trade dress." 791 F.2d 423, 427 n. 4 (1986); *Sicilia*, 732 F.2d at 434. Thus, the nonfunctionality of trade dress does not dictate a corresponding finding of inherent distinctiveness, where as here, Pebble Beach and Resorts have not shown that their trade dresses are sufficiently distinctive.

fying component to the hole.[42] Therefore, because of the uniqueness of the appearance of the lighthouse and its relation to the 18th Hole, the Court finds that the overall design of the golf hole and lighthouse are inherently distinctive.

## C. Secondary Meaning

The next question is whether the configuration of either Pebble Beach Hole 14 or Pinehurst No. 2 Hole 3 have acquired distinctiveness, or secondary meaning. The trade dress of a product achieves secondary meaning when the primary significance of the dress in the minds of consumers is not the product, but the source of the product. *Qualitex,* — U.S. at —, 115 S.Ct. at 1303. The ultimate inquiry in determining secondary meaning is whether consumers link the trade dress to a single source, even if that source is anonymous. *Two Pesos,* 505 U.S. at 768–69, 112 S.Ct. at 2757. The following factors may be relevant to a determination of whether a design has secondary meaning: (1) the duration and exclusivity of the design's use; (2) the amount and nature of advertising that emphasizes the design and its distinctive, identifying features; (3) consumer survey evidence linking the design and a single source; and (4) the defendant's intent in copying the design. *Duraco,* 40 F.3d at 1452; *Zatarains,* 698 F.2d at 795–96. Although the Court determined above that the trade dress of Harbour Town Hole 18 and the lighthouse are inherently distinctive, the Court will address whether the trade dress has also achieved secondary meaning.

### (a) Advertising

The amount and manner of advertising of plaintiffs' trade dress is circumstantial evidence relevant to a determination of secondary meaning. *Zatarains,* 698 F.2d at 796.

Advertisements that emphasize the relevant trade dress may solidify in the minds of consumers an association between the advertised trade dress and the source of the trade dress. Plaintiffs presented evidence indicating that they spend large amounts of money to advertise their golf courses and resorts. However, depictions of Pebble Beach Hole 14 and Pinehurst No. 2 Hole 3 have rarely if ever been used by Pebble Beach or Resorts in their advertisements or other printed materials. Indeed Pebble Beach failed to present even one advertisement or article depicting, discussing, or otherwise emphasizing the trade dress of Pebble Beach Hole 14. Furthermore, while Pebble Beach argues that the public has been exposed to the design of its 14th hole in books and magazines and on television during professional golf tournaments, no such evidence was presented. In fact, the evidence shows that golf literature discussing Pebble Beach invariably focuses on the more picturesque 7th and 18th holes at Pebble Beach that abut the Pacific Ocean.

Likewise Resorts failed to present any evidence showing that they have used the trade dress of the 3rd hole in their brochures and advertising. Additionally, neither golf literature nor television coverage has emphasized the trade dress of Pinehurst No. 2 Hole 3. On the other hand, the evidence shows that the 18th Hole at Harbour Town is the course's signature hole and that Sea Pines frequently uses depictions of the hole, and in particular the lighthouse behind the hole, in advertisements and promotional brochures. Additionally, Harbour Town presented evidence of numerous national golf and travel magazines and newspapers that have pictured and discussed at length the 18th Hole and lighthouse, emphasizing both its beauty and its difficulty.[43] Indeed practically every exhibit at trial depicting any part of the

---

**42.** *Taco Cabana Int'l* is instructive since there, the festive, bright decor of a Mexican restaurant was found inherently distinctive. 932 F.2d at 1119–20. Clearly not all restaurant designs are inherently distinctive merely because there are unlimited designs available. Rather, only designs that encompass arbitrary, unusual, or unique elements are sufficiently distinctive that one can assume that they convey to consumers the source of the design. Similarly, not all golf holes are inherently distinctive. However, in this case, Harbour Town Hole 18 possesses

unique, distinctive features that inherently serve to identify the source of the hole.

**43.** For example, pictures of the 18th Hole appeared in the *Legends Guide to the Golf Courses of Hilton Head Island* (PX 511), *The American Golfer's Guide* (PX 513), *The Golfer's Companion* (PX 514), *Golf World Magazine* (PX 515); *Golf Illustrated* PX (516, 517), *Senior Golfer* (PX 523), and *Newsweek* (PX 526).

Harbour Town course invariably shows the 18th hole with the lighthouse in the background. Furthermore, the 18th Hole is publicized during the MCI Heritage Classic golf tournament held each year at Harbour Town. The tournament is televised nationally and depictions of 18th Hole and its lighthouse are emphasized as the famous finishing hole upon which the tournament may be won or lost. Thus, Sea Pines' emphasis on the 18th hole in its advertisements and the widespread exposure of Harbour Town 18 in books, magazines, and on television, combined with the public's association of the hole as "the Lighthouse Hole," is strong evidence of secondary meaning.

### (b) Survey evidence

"Survey evidence is the most direct and persuasive way of establishing secondary meaning." *Zatarains*, 698 F.2d at 795. Plaintiffs did not present any survey evidence to demonstrate that their golf holes have achieved secondary meaning.

### (c) Intent to copy

Plaintiffs argue that because Tour 18 intentionally copied its golf holes, a presumption of secondary meaning is established sufficient to shift the burden to Tour 18 to disprove secondary meaning. This Court disagrees. The majority view is that evidence of intentional copying does not trigger a presumption of secondary meaning. Rather, such evidence is relevant, but not determinative, of secondary meaning. *Bristol–Myers Squibb Co. v. McNeil–P.P.C. Inc.*, 973 F.2d 1033, 1041–42 (2d Cir.1992); *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1182 n. 13 (7th Cir.1989).

In this case, it may be inappropriate to infer secondary meaning for Pebble Beach Hole 14 and Pinehurst No. 2 Hole 3 based on Tour 18's intent to copy those designs. First, Tour 18 uses the service marks PEBBLE BEACH and PINEHURST in conjunction with plaintiffs' golf hole designs. Thus, a golfer's decision to play Tour 18's replicas is not necessarily indicative of consumer recognition of the golf hole design as an indicator of the source. Rather, it is entirely possible that consumers recognize the mark

PEBBLE BEACH and desire to play a golf hole from Pebble Beach regardless of whether they recognize the design of Hole 14. *See Seabrook Foods*, 568 F.2d at 1345 (no evidence of secondary meaning of a design where consumers encounter the design only when it is coupled with a name mark). Furthermore, the evidence indicates that Tour 18 copied Pebble Beach Hole 14 and Pinehurst No. 2 Hole 3 not because it believed the holes to be famous, but because the courses and their service marks are famous. Conversely, Tour 18 copied Harbour Town Hole 18 and the lighthouse precisely because of consumers' recognition of the trade dresses of the golf hole and lighthouse. Indeed Tour 18's prominent use of depictions of its replica lighthouse on many of its advertisements confirms the conclusion that the 18th Hole and lighthouse are famous and act as indicators of source for consumers. Additionally, even if the Court inferred a presumption of secondary meaning for Pebble Beach Hole 14 and Pinehurst No. 2 Hole 3 from Tour 18's intentional copying, the evidence is sufficient to rebut that presumption. Specifically, the complete lack of advertising of the holes, witness testimony disputing the fame of the holes, and the lack of survey evidence, indicate that the holes do not have secondary meaning.

### (d) Weighing the factors

■■■ The burden of proving secondary meaning rests at all times with the plaintiffs. *The Vision Center v. Opticks, Inc.*, 596 F.2d 111, 118 (5th Cir.1979). Additionally, "a high degree of proof is necessary to establish secondary meaning." Finally, the Court notes that proving secondary meaning for plaintiffs' golf holes is particularly difficult since an individual golf hole is only one of the eighteen holes that make up an entire course. In that sense, each of the plaintiffs in this case has 18 separate trade dresses. Thus, it is difficult to demonstrate that consumers recognize and associate one particular golf hole from an entire course with the source of the hole. With those considerations in mind, the Court finds that in the absence of evidence that Pebble Beach and Resorts have emphasized their hole designs through wide-

spread advertising, and in the absence of survey evidence indicating that consumers link their holes with a particular, albeit anonymous, source, the Court finds that Pebble Beach Hole 14 and Pinehurst No. 2 Hole 3 do not act as identifiers of source for Pebble Beach and Resorts and have not achieved secondary meaning. However, even assuming Harbour Town Hole 18 is not inherently distinctive, the Court finds that Sea Pines' extensive advertising and the unsolicited publicity of the golf hole and lighthouse by golf publications, combined with Tour 18's intent to copy and use the trade dress prominently in its advertising, establishes that the design of Harbour Town Hole 18 has achieved secondary meaning.

### D. Trade Dress—Likelihood of Confusion

 As the Court has found that the trade dress of Harbour Town Hole 18 and the lighthouse are inherently distinctive and have achieved secondary meaning, Tour 18 is liable for trade dress infringement if there is a likelihood of confusion generated by Tour 18's replication and use of the trade dress. The factors relevant to determining whether there is a likelihood of confusion between the parties' trade dresses are essentially the same as those relevant to determining whether there is a likelihood of confusion between the parties trade or service marks. Specifically, the Court may consider: (1) the type or strength of plaintiff's trade dress; (2) the degree of similarity between plaintiff's and defendant's trade dress; (3) the similarity between plaintiff's and defendant's goods or services; (4) the identity of plaintiff's and defendant's customers; (5) the similarity of plaintiff's and defendants' advertising; (6) the defendant's intent; (7) the existence of actual confusion. *Taco Cabana Int'l*, 932 F.2d at 1122. This court has already concluded, based on an analysis of many of these factors, that Tour 18's use of plaintiffs' service marks causes a likelihood of confusion. Much of that analysis applies with equal force to Sea Pines' trade dress claims and support a finding of likelihood of confusion between the parties' trade dresses. Specifically, the Court's findings above that there is an identity of customers, identity of advertising, and similarity between the parties' goods

and services are applicable here and support a finding of likelihood of confusion. Additionally, the Court's determination that the Harbour Town lighthouse, when used as a service mark, is strong and entitled to broad protection, also establishes that the trade dress of the lighthouse is a strong, distinctive identifier of source for Harbour Town Golf Links. Tour 18's intent in copying the trade dress of the lighthouse and Harbour Town Hole 18 also weighs in favor of a likelihood of confusion.

The actual confusion evidence which supports the Court's finding of service mark infringement is also applicable to Sea Pines' trade dress infringement claim. Specifically, Dr. Jacoby's survey was designed to address confusion generated both by Tour 18's use of plaintiffs' service marks and replication of plaintiffs' trade dress. The results of the survey indicate that after playing Tour 18 and viewing the replicated golf holes, many golfers were confused into believing Tour 18 received permission or approval from plaintiffs to replicate their golf holes. Plaintiffs' actual confusion witnesses also stated that they believed Tour 18 received permission or approval to replicate their golf holes. According to these witnesses, this confusion was exacerbated by Tour 18's claim that it used "original" blueprints and maps to replicate the holes. Therefore, in this Court's view, Tour 18's adoption of Sea Pines' trade dress creates confusion among golfers as to whether Tour 18 sought and received assistance, approval, or permission from Sea Pines to replicate the Harbour Town lighthouse and 18th Hole.

 In sum, upon consideration of the above factors, the Court finds that Sea Pines' trade dress is inherently distinctive and/or has achieved secondary meaning, that Sea Pines' trade dress is primarily nonfunctional, and that Tour 18's trade dress is confusingly similar to Sea Pines' trade dress. Therefore, the Court finds in favor of Sea Pines on its trade dress infringement claim pursuant to section 43(a) of the Lanham Act.

### FALSE ADVERTISING

Plaintiffs allege that Tour 18's advertisements regarding the accuracy of their golf

hole copies constitute false advertising in violation of section 43(a) of the Lanham Act.[44] Specifically, plaintiffs argue that Tour 18's frequent use of the words "replica," "copy," and "simulation" to describe its golf holes mislead consumers into believing that Tour 18's golf holes are exact or very close copies of the originals. Plaintiffs argue that contrary to Tour 18's advertisements, its golf holes are materially less challenging, less beautiful, and are otherwise largely inaccurate copies of the originals.

In order to establish a claim for false advertising under the Lanham Act, a plaintiff must prove the following elements:

(1) that the defendant has made false or misleading statements of fact as to his own product or the product of another;

(2) that there is a tendency to deceive a substantial portion of the intended audience;

(3) that the deception is material in that it is likely to influence purchasing decisions;

(3) that the advertised goods or services traveled in interstate commerce; and

(4) that there is a likelihood of injury to the plaintiff in terms of declining sales or loss of good will.

*Johnson & Johnson–Merck Consumer Pharmaceuticals Co. v. Rhone–Poulenc Rorer Pharmaceuticals, Inc.,* 19 F.3d 125, 129 (3d Cir.1994). To establish elements one and two, the plaintiff may show either that the challenged advertisement is "literally false," or (2) that while the advertisement is literally true, it has a tendency to deceive consumers. *Seven–Up v. Coca–Cola Co.,* 86 F.3d 1379, 1390 (5th Cir.1996); *Castrol Inc. v. Pennzoil, Co.,* 987 F.2d 939, 943 (3rd Cir.1993). Plain-

tiffs press their false advertising claims under both theories: they argue that Tour 18's advertisements are literally false and misleading to consumers.

In defense, Tour 18 argues that its advertisements touting the accuracy of its copies constitute "puffing" and are therefore not actionable under the Lanham Act. "Puffing" is exaggerated advertising and boasting upon which no reasonable buyer would rely. *Id.* Such advertising is not actionable under section 43(a). *Castrol,* 987 F.2d at 943. Plaintiffs contend that Tour 18's uses of the words "replica," "copy," and "simulation" in its advertising tell consumers that Tour 18's holes are exactly the same as the originals. Since there are differences between the originals and Tour 18's copies, plaintiffs argue that the words, when applied to Tour 18's golf holes, are literally false. In this Court's view, Tour 18's use of "replica," "copy," and "simulation" are not literally false as applied to Tour 18's golf holes. Such words are susceptible to varying interpretations and are therefore ambiguous. *See Century 21 Real Estate Corp. v. RE/MAX South County,* 882 F.Supp. 915, 923 (C.D.Cal.1994) (words "volume" and "# 1" are ambiguous, convey no specific meaning, and cannot be literally false). Since "replica," "copy," and "simulation" could refer to varying degrees of similarity between Tour 18's golf holes and the originals, ambiguity precludes a finding of literal falsity. *Coors Brewing Co. v. Anheuser–Busch Companies, Inc.,* 802 F.Supp. 965, 969 (S.D.N.Y.1992) (a claim which is ambiguous is not literally false).

The Court also finds that plaintiffs have failed to show that using "copy," "replica," or "simulation" tends to deceive

---

**44.** The Lanham Act's prohibition against false advertising, section 43(a)(1)(B) states in relevant part:

(a) Any person who, on or in connection with any goods services, or any container for goods, uses in commerce any word term, name, symbol, or device, or any combination thereof, or any false designation of origin false or misleading description of fact or false or misleading representation of fact, which—

.　　　.　　　.　　　.　　　.

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qual-

ities, or geographic origin of his or her or another's goods services, or commercial activities shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

consumers. The burden is on plaintiffs to produce sufficient evidence to indicate that consumers are misled or deceived when they encounter the advertisements. *Johnson & Johnson,* 19 F.3d at 130. Normally, a plaintiff's success in demonstrating that a claim is misleading or deceptive turns on extrinsic evidence in the form of a consumer survey. *Id.* Here, plaintiffs did not offer survey evidence to support their false advertising claims. Rather, they presented testimony from four former customers of Tour 18 to show that they were misled by the advertisements. However, contrary to plaintiffs' assertion that the golfers' testimony supports a finding of deceptive advertising, their testimony actually confirms that golfers are not misled by the use of "replica," "copy," or "simulation" into believing that Tour 18's golf holes are exactly the same as plaintiffs' originals.[45] While these golfers may have been disappointed by the accuracy of Tour 18's replicas and thought they would be closer copies, their disappointment is not sufficient to indicate that the use of "copy," "replica," or "simulation" in Tour 18's advertisements deceives "a substantial portion of the intended audience." *Id.* at 129.

Finally, the nature of the product copied by Tour 18 precludes a finding that their use of "replica," "copy," and "simulation" to refer to its holes is false or misleading. While the evidence at trial indicated that there are numerous differences between plaintiffs' golf holes and Tour 18's copies, many of those differences relate to Tour 18's inability to replicate the natural beauty, vegetation, and landscape surrounding plaintiffs' golf holes. For example, conspicuously absent from Tour 18's copies of Harbour Town Hole 18 and Pebble Beach Hole 14 are the Calibogue Sound, Pacific Ocean, and mature cypress trees. However, it would be unreasonable for this Court to find Tour 18 liable for false advertising by calling its holes replicas and copies but failing to replicate elements that consumers would not expect to be included in the copies. Additionally, while there are other elements of plaintiffs' golf holes which Tour 18 might have replicated more accurately, there is insufficient evidence to indicate that the differences are so substantial that a finding of false or deceptive advertising is warranted. In short, based on the evidence at trial, Tour 18's golf holes, while not perfect copies, are sufficiently accurate to be advertised as "copies," "replicas," and "simulations."

## DILUTION

Plaintiffs allege causes of action under Texas' anti-dilution statute. The statute provides:

A person may bring an action to enjoin an act likely to injure a business reputation or to dilute the distinctive quality of a mark registered under this chapter or Title 15, U.S.C., or a mark or trade name valid at common law, regardless of whether there is competition between the parties or confusion as to source of goods or services.

Tex.Bus & Com.Code Ann. § 16.29 (West Supp.1996). The Texas anti-dilution statute offers broader protection for marks than federal law since it allows injunctive relief regardless of whether there is competition be-

---

**45.** For example, Lynne Janis testified as follows:

Q: Okay, but you wouldn't expect [the hole] to be exactly the same; is that correct?

A: No. That's I think almost difficult.

Q: And that certainly was your expectation going there, that there was no way that Tour 18 was going to be able to exactly replicate every hole that they had replicated out there; right?

A: Correct. For all the holes that were advertised and all the holes when you go to play, you have to give and, in my estimation the give would be the course in the vegetation itself. Because throughout the United States you're not going to replicate stuff that's up at Oakmont, for example, because of the nature of the area.

Terry Klare stated the following:

Q: When you played Tour 18 what assumptions, if any, did you make about whether or not the holes would be good copies, average copies, bad copies of the original holes?

A: I made the assumption they'd be good copies.

Q: And what was the basis of that assumption?

A: I guess the brochure that I read.

. . .

A: They're really not and quite frankly, it's impossible for a guy to do that—or for a company to do that, duplicate a hole.

tween the parties or likelihood of confusion as to the source of goods or services. *Service Merchandise Co. v. Service Jewelry Stores, Inc.,* 737 F.Supp. 983, 993 (S.D.Tex. 1990). However, the statute went into effect in 1989, and as of the date of this opinion, Texas courts have not yet interpreted the scope of protection provided by the statute.[46]

▇ As an initial matter, Tour 18 argues that plaintiffs' Texas anti-dilution claims are preempted by federal law. Tour 18 asserted this argument earlier in the litigation in a motion for summary judgment. At that time, this Court noted that the issue of preemption of section 16.29 is an issue of first impression in this Circuit. However, relying on decisions from other jurisdictions which have interpreted similar anti-dilution statutes, this Court held that the Texas anti-dilution statute is not preempted by federal law. *See Kohler v. Moen, Inc.,* 12 F.3d at 641 (*Sears* and *Bonito Boats* do not preclude state regulation of trade mark/trade dress infringement); *Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 702 F.Supp. 1031, 1040 (S.D.N.Y.1988) *rev'd on other grounds,* 875 F.2d 1026 (2d Cir.1989) (finding no preemption of New York's anti-dilution statute). This Court stands by its earlier ruling and finds that the Texas anti-dilution statute is not preempted by federal law.

Tour 18 also argues that the Texas anti-dilution statute only applies where there is use of a direct copy of a distinctive trademark on *non*-competing goods. Tour 18 argues that where goods are in direct competition, the application of an anti-dilution statute would violate the public policy in favor of free competition. Instead, Tour 18 argues, trademark infringement laws, not

state anti-dilution statutes, provide protection where competing goods are involved.

▇ There is a split of authority on whether the anti-dilution laws of the various states should extend to competing goods.[47] Based on the plain meaning of the Texas statute, which states that relief may be granted "*regardless* of whether there is competition between the parties," this Court finds that the Texas anti-dilution statute applies to competitive goods and services. Tex. Bus. & Com.Code Ann. § 16.29 (emphasis added). Having determined that the Texas anti-dilution statute is not preempted by federal law and that the statute applies to competing goods, the Court now proceeds to determine whether plaintiffs have proven liability under the statute.

▇ The purpose of an anti-dilution statute is to prevent the gradual "whittling away" of a party's distinctive trademark or trade name. *Fruit of the Loom, Inc. v. Girouard,* 994 F.2d 1359, 1363 (9th Cir.1993). In order to establish a dilution claim, the plaintiff must show (1) ownership of a distinctive mark and (2) a likelihood of dilution. *Hormel Foods Corp. v. Jim Henson Productions, Inc.,* 73 F.3d 497, 506 (2nd Cir.1996). A likelihood of dilution may be shown under two separate theories: dilution by "blurring" or "tarnishment." *Id.; Jordache Enter. Inc. v. Hogg Wyld, Ltd.,* 828 F.2d 1482, 1489 (10th Cir.1987). Plaintiffs in the instant case contend that Tour 18's actions will dilute their service marks under both theories of dilution.

▇ In order to recover for dilution, plaintiffs must first show that their service marks are distinctive. *Deere & Co. v. MTD Prod., Inc.,* 41 F.3d 39, 42 (2d Cir.1994). For the purposes of determining distinctiveness of a mark to show dilution, the Court consid-

---

**46.** Similar anti-dilution statutes have existed in other jurisdictions for years and their interpretation is relevant here. In particular, Texas' statute tracks the language of New York's statute. New York's statute provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to source of goods or services.

N.Y.Gen.Bus.Law § 368–d (McKinney 1984).

**47.** For example, New York and California anti-dilution laws have been construed to apply to competing goods and services. *See Nikon Inc. v. Ikon Corp.,* 987 F.2d 91, 96 (2d Cir.1993); *Toho Co., Inc. v. Sears, Roebuck & Co.,* 645 F.2d 788, 793 (9th Cir.1981). In contrast, the Seventh Circuit has held that the Illinois anti-dilution statute does not apply to competing goods or services. *See AHP Subsidiary Holding Co. v. Stuart Hale Co.,* 1 F.3d 611, 619 (7th Cir.1993).

ers: (1) whether the mark is arbitrary; (2) the length of time a user has employed the mark; (3) the scope of the user's advertising and promotions; (4) the nature and extent of the first user's business; and (5) the scope of the first user's reputation. *International Jensen v. Metrosound U.S.A.*, 4 F.3d 819, 826 (9th Cir.1993).

■■■■ This Court held above that plaintiffs' service marks are strong and distinctive for the purposes of likelihood of confusion analysis. Indeed the Court held that the marks PEBBLE BEACH, PINEHURST, HARBOUR TOWN, and the Harbour Town lighthouse have achieved secondary meaning in the minds of golfers. The Court acknowledges that a somewhat stricter standard is to be applied in determining "strength" in dilution analysis than in likelihood of confusion analysis. *See* 3 McCarthy § 24.17[2] (noting that in dilution analysis, "more in the form of marketplace fame and recognition is needed" for a mark to be strong). However, based on plaintiffs' long and extensive use of the marks, their national reputations, and their advertising and promotional efforts, the Court finds that PEBBLE BEACH, PINEHURST, HARBOUR TOWN, and the Harbour Town lighthouse are strong, distinctive marks entitled to protection under the Texas anti-dilution statute. Additionally, the trade dress of the Harbour Town is sufficiently strong and famous to be diluted.

## A. Tarnishment

■■■■■ Dilution by tarnishment occurs when a mark is "linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context" such that "the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods." *Deere & Co.*, 41 F.3d at 43. In the instant case, plaintiffs presented evidence which they contend indicates Tour 18 has used plaintiffs' marks in unsavory contexts.[48] However, after considering plaintiffs' alleged instances of tarnishment, the Court finds that they are isolated occurrences that are not likely to tarnish plaintiffs' marks. Tarnishment is more easily found where a defendant's *primary* purpose in using the mark is to place it in an unsavory context. *See id.* at 41–42 (competitor's alteration of mark for use in spoof advertisement created risk that consumers would come to attribute unfavorable characteristics and ultimately inferior goods and services with mark); *Coca–Cola v. Gemini Rising, Inc.*, 346 F.Supp. 1183 (E.D.N.Y.1972) (dilution present where company altered mark "Coca–Cola" in making posters with the caption "Enjoy Cocaine"). Tour 18's primary uses of plaintiffs' marks, in its advertisements and on its golf course signs, does not connote anything unfavorable about plaintiffs' golf holes or marks. Rather, because of its replica concept, Tour 18's success is in large part dependent on plaintiffs' reputations. Thus, Tour 18 has a clear incentive to promote plaintiffs' reputations in order to attract golfers. Mindful of that incentive, Tour 18's advertisements and signs on the golf course consistently tout the quality of plaintiffs' golf courses and the fame of their marks.

Additionally, there was no evidence at trial to indicate that the appearance of plaintiffs' marks in the calendar, or the presence of topless women caddies on the Tour 18 golf course, had any tarnishing effect on those marks. While some of the methods Tour 18 has chosen to conduct its business and advertise its golf course are inconsistent with

48. Specifically, Plaintiffs' exhibit 284 is a calendar entitled "Texas Girls of the Greens" which Tour 18 sponsored as a means of advertising its golf course. The calendar consists of photographs of bikini-clad women posing while standing (or lying) on the Tour 18 course. There is a caption below the photo for each month of the year, including: "Ball Washers!", "Water Balls!", "The Skins Game!", "Play it Where it Lies", "In the Leather!", and "Amen!" On the second page of the calendar there is a detailed advertisement for Tour 18 with pictures of Tour 18's replica holes of Pinehurst No. 2 Hole 3 and Harbour Town Hole 18. Appearing below pictures of the replica holes are plaintiffs' marks "Pinehurst #3" and "Harbour Town #18." The Harbour Town and Pinehurst marks also appear in a separate advertising caption in the calendar.

There was also testimony during trial that Tour 18 hosts private tournaments sponsored by local nightclubs during which topless women serve as caddies. Plaintiffs argue that by holding golf tournaments involving nudity and placing their marks in a bikini calendar, Tour 18 has tarnished their reputations and goodwill.

plaintiffs' storied reputations as premier golf resorts, the Court finds that the bikini calendar and the topless activities are isolated incidents that are more likely to affect Tour 18's reputation than the goodwill associated with plaintiffs' marks.

Plaintiffs also ground their tarnishment claims on the quality and accuracy of the Tour 18 replicas. Plaintiffs' argument in this respect is two-fold. First, plaintiffs argue that the Tour 18 course is maintained in shoddy condition so that plaintiff's marks will suffer negative associations through Tour 18's use of the marks on an inferior golf course. Second, plaintiffs claim that Tour 18's replicas are inaccurate copies and are substantially less challenging and beautiful than the original holes. Thus, plaintiffs argue, since Tour 18's advertisements tell golfers that their golf holes are replicas of plaintiffs' originals, golfers who have never played the originals will attribute unfavorable and inaccurate characteristics to plaintiffs' marks.

The only evidence presented by plaintiffs to demonstrate the allegedly shoddy condition of Tour 18 was a videotape of the Tour 18 course showing standing water in one of Tour 18's sand bunkers. However, the testimony at trial also indicated that the vast majority of golf courses, including plaintiffs' courses, occasionally experience weather-related or other temporary maintenance difficulties. Furthermore, the evidence at trial indicated that while Tour 18 may have experienced some problems with the condition of its greens during its first year of business, such problems are normal for a new golf course whose grass and other vegetation has not yet matured. If golfers experience water in sand bunkers or other shoddy maintenance conditions on the Tour 18 course, the golfer is likely to direct his displeasure at Tour 18, not plaintiffs. Thus, plaintiffs' first argument regarding tarnishment of their marks through association with shoddy course conditions is without merit.

Plaintiffs second argument focuses on the accuracy, beauty, and difficulty of Tour 18's replica holes. Plaintiffs claim that because Tour 18's replicas are less challenging than the originals, the public's association of their marks with challenging golf holes will be tarnished should golfers play Tour 18 and believe that the replicas are the same or substantially the same as plaintiffs' holes. It is true that Tour 18's replicas are less beautiful and less challenging than the originals. For example, after viewing videotapes of the original Pebble Beach Hole 14 and Tour 18's replica, it is clear that the original Hole 14, with its views of the Pacific Ocean, large cypress trees, and dramatic elevation changes, is substantially more striking than Tour 18's replica. The same holds true for Harbour Town's Hole 18 which is surrounded by the Calibogue Sound, luxury resort homes, the dominating lighthouse, and a marina filled with yachts. There was also testimony from golfers who have played both plaintiffs' original golf holes and Tour 18's replicas indicating that the originals are more challenging. However, it does not follow that Tour 18's use of plaintiffs' marks dilutes the public's established association of those marks with difficult, striking golf holes. The evidence showed that much of what makes plaintiffs' golf holes beautiful are scenic vistas of the Pacific Ocean, Calibogue Sound, and other elements surrounding plaintiffs' holes. Consumers do not expect Tour 18's replicas to include views of the Pacific Ocean, huge cypress trees, the Calibogue Sound, or yachts at a luxurious marina. It is unlikely that plaintiffs' reputations will be diluted when a golfer playing Tour 18 notices that its replicas are not as spectacular as the originals. While Tour 18's advertising creates certain expectations in golfers with respect to the difficulty and playability of the replicas, the Court finds that the risk that plaintiffs' marks will suffer tarnishment is speculative at best. Rather, the evidence at trial showed that where golfers were disappointed in the overall difficulty and appearance of Tour 18's golf holes, they focused their displeasure on Tour 18 and not plaintiffs.[49] Therefore, the Court finds that plain-

---

49. Plaintiff's witness, Jay Miller, stated:
 "Well I think going in we knew they couldn't have the Atlantic Ocean or the Pacific ocean there. So, that was an obvious thing. But we

anticipated that the holes would be—from everything I'd seen and read, that they were going to be really, really close to the original holes. When we played them, we were kind of

tiffs have not established dilution through tarnishment.

## B. Blurring

■■■■■ Dilution by blurring occurs when "[c]ustomers or prospective customers ... see the plaintiff's mark used on a plethora of different goods and services." *Hormel Foods*, 73 F.3d at 506 (quoting 3 McCarthy § 24.13[1][a][i] ). Thus, dilution by blurring may occur where the defendant uses the plaintiff's mark to identify the defendant's goods and services, "raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." *Deere & Co.*, 41 F.3d at 43. *See also Jordache Enters.*, 841 F.Supp. at 522 (Dilution from blurring " 'refers to a loss of distinctiveness, a weakening of a mark's propensity to bring to mind a particular product, service, or source of either.' " (quotations omitted)). "If the plaintiff holds a distinctive trade mark, it is enough that the defendant has made significant use of a very similar mark." *Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1186 (11th Cir.) *cert. denied*, 474 U.S. 845, 106 S.Ct. 134, 88 L.Ed.2d 110 (1983).

■■■■ In this case, plaintiffs have shown that they own strong, distinctive marks and that Tour 18 has made significant use of those marks to sell its own services to the public. It is because of Tour 18's use of those service marks that golfers will now think of Tour 18, and not necessarily plaintiffs, when they encounter the marks. The result is that Tour 18 has whittled away at the ability of these service marks to identify only plaintiffs' golfing services. Therefore, this Court finds that plaintiffs have proven the necessary elements to establish dilution of the service marks PEBBLE BEACH, HARBOUR TOWN, and PINEHURST under the Texas anti-dilution statute.

■■■■ Plaintiffs also seek protection under the Texas anti-dilution statute for the trade dresses of their golf holes and for the trade dress of the Harbour Town lighthouse. Anti-dilution statutes have been held to apply "with equal force" to protection of trade

dress. *Merriam–Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 73 (2nd Cir.1994) (interpreting New York anti-dilution statute). The same standard for establishing service mark dilution applies to a trade dress dilution claim. Specifically, the plaintiff must show that its trade dress is distinctive and that there is a likelihood of dilution. *Id.* After considering the evidence of plaintiffs' individual trade dresses, the Court finds that only the trade dress of the 18th Hole at Harbour Town and the lighthouse have the strong, distinctive, source-identifying characteristics required for protection under the anti-dilution statute. The Court's previous determination that the configurations of Pebble Beach Hole 14 and Pinehurst No. 2 Hole 3 are not distinctive and do not act as indicators of source is equally applicable here and dictate a finding that these designs are not entitled to protection under the Texas anti-dilution statute. Conversely, the 18th Hole at Harbour Town and the lighthouse visible in its backdrop are distinctive designs which Sea Pines has labored to cultivate into valuable, well-recognized trademarks. Thus, they qualify for protection under the statute.

■■■■ There is no dispute that Tour 18 has made significant use of the trade dress of the Harbour Town lighthouse. Tour replicated it for both its Houston and Dallas area golf courses and uses its depiction on almost every advertisement and promotional brochure. This duplication, in the Court's view, has weakened the lighthouse's propensity to bring to golfer's minds Harbour Town when they encounter the trade dress of the lighthouse. Therefore, the Court finds for Sea Pines on its trade dress dilution claims.

## PEBBLE BEACH'S COPYRIGHT INFRINGEMENT CLAIM

Pebble Beach asserts a copyright infringement claim and an unfair competition claim against Tour 18 arising out of Tour 18's purchase and use of two maps to build its replica of Pebble Beach Hole 14. Pebble Beach claims that the maps used by Tour 18 are copyrighted and that Tour 18's action in obtaining the maps constitutes unfair compe-

let down, basically, because they weren't as close as we had anticipated."

tition. The evidence at trial showed that in early 1991, Barron Jacobsen traveled to Pinehurst to investigate potential golf holes that could be copied for Tour 18's Houston course. While at Pinehurst, Jacobsen received the name of Ed Connor, a golf course architect known for surveying a producing maps of existing golf holes.

The evidence showed that Connor had recently performed services for a number of famous golf courses around the nation, including Augusta National, Pebble Beach and Pinehurst. As a result of his work, Connor possessed copies of topographic maps he made for the courses. Jacobsen contacted Connor and in April 1991 Tour 18 purchased a collection of maps for $4,016.

Two of the maps sold to Tour 18 are at issue. One map depicts the green complex of Pebble Beach Hole 14. That map was created by Connor while he worked for Pebble Beach. The other map, which depicts the fairway of Pebble Beach Hole 14, is a portion of a map sent to Pebble Beach by Bestor Engineers, Inc. ("Bestor Map") which was made by Hammond, Jensen, Wallen, & Assoc. ("Hammond Jensen") based on information from an aerial survey. The Bestor map was apparently obtained by Connor while he was working at Pebble Beach as independent contractor in early 1991.

At the time Connor sold the maps to Tour 18, neither map was copyrighted. Furthermore, at the time Connor created the map, Connor and Pebble Beach had no oral or written agreement regarding copyrights in the map. Connor executed an "Independent Contractor Agreement" with Pebble Beach on September 21, 1991, after he had completed the work at Pebble Beach and after he had sent the maps to Tour 18. On January 12, 1992, Connor executed a copyright assignment of his map to Pebble Beach on January 12, 1992. On February 6, 1992, Connor executed a second amended assignment that was back-dated to September 25, 1991 to correspond with the original independent contractor agreement. Subsequently, Pebble Beach obtained a Copyright Registration Number Vau277–686 for the Connor Map.

At the time the Bestor map was created for Pebble Beach, the agreement between Pebble Beach and Bestor expressly provided that the maps and other work product was the property of Bestor. However, in late 1991 Pebble Beach obtained a copyright assignment for the rights to the Bestor map. Pebble Beach then copyrighted the Bestor Map which is identified by Copyright Registration Number Vau277–687.

 Tour 18 first argues that the maps are not copyrightable because they contain only factual information. Maps may be protectable pursuant to the Copyright Act as "pictorial, graphic and sculptural works", 17 U.S.C. § 101, provided the work is original and possess adequate creativity. *See Feist Publications, Inc. v. Rural Telephone Service Co.,* 499 U.S. 340, 361–63, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991); *Hodge Mason Maps, Inc. v. Montgomery Data, Inc.,* 967 F.2d 135, 141–42 (5th Cir.1992). "The level of creativity required to make a work of authorship original 'is extremely low; even a slight amount will suffice.'" *Hodge,* 967 F.2d at 142 (quoting *Feist,* 499 U.S. at 345, 111 S.Ct. at 1287). In the instant case, the Bestor and Connor maps possess sufficient creativity to merit copyright protection. Indeed Pebble Beach has obtained copyright registrations for both maps. However, even though Pebble Beach's maps may be entitled to copyright protection, the evidence indicates that Pebble Beach acquired the copyright assignment from Connor and registered the maps *after* the maps had already been sold to Tour 18. Thus, since Tour 18 purchased and used the maps before Pebble Beach established copyrights in the maps, Tour 18 did not infringe Pebble Beach's copyright.

## PLAINTIFFS' CIVIL CONSPIRACY CLAIMS

 Plaintiffs claim that Tour 18 and Ed Connor engaged in a civil conspiracy when Connor sold the Bestor and Connor maps to Tour 18. A civil conspiracy under Texas law is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful

means. *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex.1983).

■ The evidence in the case is insufficient to show a civil conspiracy. First, since the maps were not copyrighted at the time Connor sold them to Tour 18, use of the maps by Tour 18 did not constitute copyright infringement. Thus, Connor did not assist Tour 18 in an unlawful activity. Furthermore, a civil conspiracy requires a meeting of the minds on a certain course of action. *Id.* The evidence is insufficient to establish that Connor and Tour 18 had a meeting of the minds on the object of replicating plaintiffs' golf holes. Finally, although plaintiffs presented some evidence indicating that Connor was not authorized to sell maps to Tour 18 or any other third party, there was also evidence that Connor and Pebble Beach never had a formal written agreement regarding copyrights in the maps. Thus, plaintiffs have not shown that Connor's sale of the maps was unlawful.

## PLAINTIFFS' CONVERSION CLAIMS

Plaintiffs assert claims of conversion and unfair competition arising out of Tour 18's videotaping of plaintiffs' golf holes. Specifically, plaintiffs allege that Tour 18 "surreptitiously videotaped plaintiffs' trade dress, which it used for its own commercial purpose."

■ Pursuant to Texas law, conversion is the wrongful exercise of dominion and control over personal property of another, to the exclusion of or inconsistent with the owner's property rights. *Amarillo National Bank v. Komatsu Zenoah America, Inc.*, 991 F.2d 273, 274 (5th Cir.1993). In this case, the property alleged to have been converted is the appearance of plaintiffs' golf holes captured on videotape. It is therefore intangible property. While conversion generally only applies to tangible property interests, courts have recently relaxed this rule to allow actions for conversion of intangible property rights in limited circumstances. Specifically, courts have held that intangible property rights can be converted where the underlying intangible right has been merged into a document. *See e.g.,*

*Hurst v. Dezer/Reyes Corp.*, 82 F.3d 232, 236 (8th Cir.1996) (even under "expanded definition of tort" under New York law, business concept and appearance of a diner could not be converted since claimed property rights were not rights customarily merged in a document); *H.J., Inc. v. International Telephone and Telegraph Corp.*, 867 F.2d 1531, 1547 (8th Cir.1989) (claimed intangible property interest in business network was not convertible under Minnesota law since network was not evidenced by any document). In *Prewitt v. Branham*, the Texas Supreme Court held that the conversion of a lease in which the rights of the lessee had been merged supported a conversion action for the value of the rights represented by the document. 643 S.W.2d 122, 123 (Tex.1983). Here, plaintiffs do not claim that any document encompasses an intangible property right to the appearance of their golf holes and that there has been conversion of such document amounting to conversion of the underlying right. Therefore, their conversion action must fail.

■ Plaintiffs also argue that Tour 18's videotaping of their golf holes constitutes common law unfair competition. It is true that the law of unfair competition is meant to sanction general business practices beyond the scope of traditional intellectual property law. 3 McCarthy § 27.02[1]. However, in this case the Court finds that the evidence regarding Tour 18's videotaping of the plaintiffs' golf holes is insufficient to establish a claim of common law unfair competition. Specifically, the evidence indicates that video cameras are allowed at all three plaintiffs' golf courses. Additionally, there was conflicting testimony at trial regarding whether there are signs placed at plaintiffs' golf courses notifying golfers that commercial photography is prohibited. Thus, the Court finds that Tour 18's videotaping of plaintiffs' golf holes, while suspect, does not amount to unfair competition.

## TOUR 18'S COUNTERCLAIMS

Tour 18 asserts counterclaims against plaintiffs for unfair competition, tortious interference with business relations, and for civil conspiracy to commit each of these torts.

Tour 18's counterclaims are grounded on the allegation that plaintiffs' claims in this proceeding were "without justifiable basis" when filed, and were brought in bad faith and solely for the purpose of injuring Tour 18's existing or prospective business relations.

 The elements of a cause of action for tortious interference with an existing contract under Texas law are: (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) such act was proximate cause of damage, and (4) actual damage or loss. *Thrift v. Hubbard*, 44 F.3d 348, 356 (5th Cir.1995). A cause of action for interference with prospective contracts requires (1) a reasonable probability that the parties would have entered into a contractual relationship; (2) an intentional and malicious act by the defendant that prevented the relationship from occurring and with the purpose of harming the plaintiff; (3) the defendant lacked privilege or justification to do the act; and (4) actual harm or damage resulted from the interference. *Id.* at 356–57. Finally, a cause of action for interference with business relations requires proof of (1) the existence or prospect of a contract; (2) an intentional and willful act interfering with the contract that was calculated to cause damage to the plaintiff; and (3) damages. *Manders v. Manders*, 897 F.Supp. 972, 977 (S.D.Tex. 1995).

 In the instant case, there is no evidence to indicate that plaintiffs tortiously interfered with Tour 18's existing or prospective contracts or that they interfered under the broader rubric of interference with business relations. Rather, at all times during this litigation, plaintiffs asserted their claims in good faith. Indeed the Court has ruled in favor of plaintiffs on many of their claims. Thus, the claims clearly were not meritless or in bad faith when originally filed. Therefore, even if the Court assumes Tour 18 possessed existing or prospective contracts with which plaintiffs interfered, such interference is not actionable since plaintiffs had a good faith legal justification in filing suit against Tour 18. *See International Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1268–69 (5th Cir.1991); *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 939–40 (Tex.1991) (party exercising its legal rights in good faith cannot tortiously interfere with another's prospective business relations).

 Tour 18 argues that Pebble Beach's bad faith was manifested in its refusal to settle this matter and subsequent filing of this suit notwithstanding Tour 18's offer to remove Pebble Beach's name from its replica hole and to alter an element of the replicated design. However, the evidence at trial showed that Pebble Beach broke off settlement negotiations when Tour 18 insisted that the settlement be kept confidential. Undoubtedly part of Pebble Beach's impetus for filing this suit was its fear of future efforts by third parties following in the footsteps of Tour 18's enormous financial success. Thus, Pebble Beach acted reasonably and not in bad faith when it insisted on a public settlement in order to deter future replica courses from copying their holes. Furthermore, there was evidence of frequent correspondence between Pebble Beach and Tour 18 indicating that Pebble Beach was willing to settle the litigation should Tour 18 allow them to publicize the settlement.

 Tour 18 also argues that the parties conspired to interfere with their contract and business relations. As stated before, a civil conspiracy requires a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Massey v. Armco Steel Co.*, 652 S.W.2d at 934. To be actionable there must be "an unlawful, overt act in furtherance of the conspiracy." *Id.* The Court finds that there was no civil conspiracy. The Court's finding that plaintiffs' claims were not objectively without merit but were in good faith when filed establishes that there was no civil conspiracy: because no wrongful act was committed, there can be no finding of conspiracy. *Ross v. Arkwright Mut. Ins. Co.*, 892 S.W.2d 119, 132 (Tex. App.—Houston [14th Dist.] 1994, no writ).

 Tour 18 also asserts a counterclaim for common law unfair competition. Specifically, Tour 18 alleges that plaintiff's individual and collective actions in instituting and maintaining this litigation subjects them

to liability for unfair competition under Texas law. Liability for unfair competition under Texas law cannot be imposed without a finding of an independent substantive tort or other illegal conduct. *Schoellkopf v. Pledger,* 778 S.W.2d 897, 904–05 (Tex.App.—Dallas 1989, writ denied). The Court has found that plaintiffs did not tortiously interfere with Tour 18's business relations or contracts by instituting and maintaining this litigation. The Court has also found that plaintiffs maintained this suit in good faith. Thus plaintiffs committed no independent tort or other illegal conduct on which to premise a claim of unfair competition.

## REMEDIES

The Court has found Tour 18 liable for the following: service mark infringement, trade dress infringement, and unfair competition in violation of the Lanham Act; common law unfair competition; and dilution under the Texas anti-dilution statute. The Court now addresses the appropriate remedy to be imposed. Plaintiffs seek, damages, injunctive relief, and attorney's fees and costs.

 Section 35 of the Lanham Act provides that a prevailing party may, "subject to the principles of equity ... recover (1) defendant's profits, (2) any damages sustained by plaintiff, and (3) the costs of the action. The Court in exceptional cases may award reasonable attorney's fees to the prevailing party." 15 U.S.C. § 1117. This provision applies to claims brought under section 43(a) as well as claims brought for infringement of registered marks. *Taco Cabana Int'l,* 932 F.2d at 1125. "[S]ection 35 endows the district court with considerable discretion in fashioning an appropriate remedy for infringement." *Id.* at 1127. Plaintiffs did not provide any evidence of actual damages in the form of lost good will, damage to reputation, or diverted or lost sales. Thus there is no evidentiary support for an award of actual damages.

 Plaintiffs also seek an accounting of Tour 18's profits under the theory of unjust enrichment. Tour 18 contends that plaintiffs are not entitled to an accounting of profits. Normally an award of profits to a

prevailing plaintiff is appropriate where the defendant's infringement is willful. *Joy Mfg. Co. v. CGM Valve & Gauge Co., Inc.,* 730 F.Supp. 1387, 1395 (S.D.Tex.1989). Additionally, "[w]hile the diversion of sales is not a prerequisite to an award of profits, it is one of the factors to be considered." *Texas Pig Stands v. Hard Rock Cafe Int'l,* 951 F.2d 684, 695 (5th Cir.1992) (citations omitted). In this case, the issue of whether plaintiffs are entitled to an award of monetary damages, in whatever form, is complicated by their partial success in this case. Even if the Court, based on the evidence at trial, were able to accurately compute Tour 18's profits, it would be impossible to apportion the amount based on each plaintiff's individual claims. For example, while Pebble Beach prevailed on its service mark infringement claim, it did not prevail on its trade dress infringement claim. This Court cannot determine what portion of Tour 18's profits would be appropriate to award Pebble Beach for prevailing only on its service mark infringement claim. Thus, the speculative nature of the remedy weighs against an award of profits. Furthermore, the complete lack of evidence indicating lost or diverted sales mitigates against an award of profits. *Id.* Finally, absent a finding of infringement coupled with some combination of additional factors, an injunction alone can satisfy the equities of the case. *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.,* 750 F.2d 903, 917 (Fed.Cir. 1984). In this Court's view, the fact that plaintiffs only partially prevailed, coupled with the absence of evidence indicating lost sales or good will, make this a case in which injunctive relief, rather than an award of profits, is the appropriate remedy.

 Both Tour 18 and plaintiffs seeks attorney's fees to the extent each is a prevailing party. As stated above, a prevailing party under the Lanham Act may be entitled to attorney's fees, provided the case is "exceptional." 15 U.S.C. § 1117. The prevailing party has the burden to demonstrate the exceptional nature of the case by clear and convincing evidence. *Seven–Up v. Coca–Cola Co.,* 86 F.3d 1379, 1390 (5th Cir. 1996). "An exceptional case is one where the violative acts can be characterized as 'malicious,' 'fraudulent,' 'deliberate,' or 'willful.' "

*Id.* Plaintiffs argue that this case is exceptional because of Tour 18's deliberate copying of their service marks and golf hole designs. Deliberate copying does not per se establish that a case is exceptional. *CJC Holdings v. Wright and Lato,* 979 F.2d 60, 65 (5th Cir. 1992). Rather, the Court must examine all the facts and circumstances in the case. *Id.* While the evidence unquestionably shows Tour 18 deliberately copied plaintiff's golf holes and plaintiff's marks for use in its advertising and promotional brochures, the Court finds that Tour 18's actions did not rise to the level necessary for a finding of exceptionality. First, Tour 18 did not use plaintiffs' marks with the intent of stealing customers away from plaintiffs. *See Id.* (noting that such "preying" conduct would support a determination of exceptionality). Moreover, while plaintiffs established Lanham Act violations for service mark infringement and infringement of Sea Pines' trade dress, plaintiffs did not offer any proof showing that Tour 18's actions resulted in actual damage. *Id.* (stating that lack of damages is an important consideration in determining whether a case is exceptional). Some evidence also indicates Tour 18 believed in good faith that it could copy plaintiffs' golf holes and use their service marks in advertising without causing confusion. This is demonstrated by, among other evidence, Tour 18's utilization of disclaimers. While this Court has found infringement based in part on a determination that Tour 18's current disclaimers are insufficient to cure the likelihood of confusion as to affiliation or permission, liability for infringement by itself does not establish exceptionality. In light of the closeness of the issues in this case, neither side asserted an unreasonable position.

Finally, the Court finds that the result of this case weighs against a finding that the case is exceptional. Plaintiffs only partially prevailed on their Lanham Act claims. Similarly, while Tour 18 was successful in defending against many of plaintiffs' claims, they are liable for service mark infringement arising out of Tour 18's use of plaintiffs' service marks and for infringement of Sea Pines' distinctive trade dress. Additionally, the Court found no merit in Tour 18's various counterclaims. Thus, the mixed results achieved by both sides mitigate against a finding of exceptionality and support a denial of attorney's fees for all parties.

■ Plaintiffs seek injunctive relief. The Court has the discretion to issue an injunction to cure service mark and trade dress infringement under the Lanham Act. 15 U.S.C. §§ 1116, 1125(c). To remedy Tour 18's infringement of Sea Pines' trade dress and service marks, the Court issues an injunction, enjoining Tour 18 from using or constructing a replica golf hole, lighthouse, or other trade dress that is confusingly similar to the trade dress of Harbour Town Hole 18 and requiring Tour 18 to take corrective action to alter its confusingly similar replicas of Harbour Town Hole 18 and the Harbour Town lighthouse. Additionally, the Court enjoins Tour 18 from making any future unauthorized use of the service marks HARBOUR TOWN and representations or depictions of the Harbour Town lighthouse.

■ However, the crafting of an injunction to remedy Tour 18's infringement of the marks PEBBLE BEACH and PINEHURST is complicated by the Court's finding that Tour 18 may legally replicate Pebble Beach Hole 14 and Pinehurst No. 2 Hole 3. As stated before, case law holds that a party may use another's mark in truthful comparative advertising and to inform the public of the true origin of the product or design. *Calvin Klein Cosmetics,* 815 F.2d at 503; *Smith v. Chanel,* 402 F.2d at 569. Thus, precluding all uses of the marks PEBBLE BEACH and PINEHURST would contravene applicable case law since it would eliminate Tour 18's ability to use the marks in a purely descriptive context. The First Circuit addressed this problem in *Hypertherm Inc. v. Precision Products, Inc.,* 832 F.2d at 701–02. There, in order to remedy confusion generated by the defendant's use of the plaintiff's trademark while advertising its imitation replacement parts, the district court imposed an absolute injunction enjoining all uses of the plaintiffs' mark in marketing or otherwise. The First Circuit reversed, holding that the absolute injunction imposed by the district court "roamed too broadly" by

precluding use of the mark in fair, comparative advertising. The court stated:

> Though the evidence engenders small sympathy for the defendant–PPI obviously tried to take advantage of plaintiff's success, and cut too close to the bone in the process–the decree should have permitted it to use the Hypertherm name and the like in a purely descriptive sense for the limited purpose of comparative marketing.

*Id.* at 701. The court then remanded the case, instructing the district court to formulate an injunction allowing the defendant to use the plaintiffs' mark in purely comparative advertising but also ensuring that the defendant exercised affirmative steps to eliminate any likelihood of confusion as to source, sponsorship, and affiliation. *Id.*

This Court is faced with similar considerations. It would be improper for the Court to allow Tour 18 to copy Pebble Beach Hole 14 and Pinehurst No. 2 Hole 3 but at the same time enjoin Tour 18 from mentioning the names of the original golf holes. Thus, the Court must craft an injunction that remedies the confusion generated by Tour 18's unfair service mark usage of the marks PEBBLE BEACH and PINEHURST, but preserves Tour 18's right to use the marks in a purely descriptive and non-confusing advertising context. In the Court's view this result is best achieved by allowing Tour 18 limited use of the service marks PEBBLE BEACH and PINEHURST in its advertisements and promotional materials as long as such usage is coupled with a prominent disclaimer of association, affiliation, sponsorship, and permission. While the current Tour 18 disclaimers contain sufficient language of disclaimer, their size, location, and prominence must be increased. Additionally, Tour 18 must remove all superfluous, "attention-getting" uses of PEBBLE BEACH and PINEHURST from its scorecards, yardage guides, menu, mailers, and other promotional materials. This injunction will restrict Tour 18 from trading on the good will of the service marks by requiring Tour 18 to emphasize its own name, not plaintiffs', in its advertisements and promotional materials. Additionally, the injunction will protect the public from being confused by deceptive advertisements and claims that engender an affiliation, association, or sponsorship between the parties. Therefore, based on the foregoing, the Court

ORDERS that plaintiffs are entitled to permanent injunctive relief as follows:

(1) Defendant Tour 18 and all persons in active concert or participation with defendant are permanently enjoined from using in connection with the promotion, advertising, or sale of golfing services, a replica of the Harbour Town lighthouse, Harbour Town Golf Links Hole 18, or any other trade dress that is confusingly similar to Sea Pines' trade dress.

(2) Defendant and all persons in active concert or participation with defendant are permanently enjoined from using in connection with the promotion, advertising, or sale of golfing services, the service marks "HARBOUR TOWN," "HARBOUR TOWN GOLF LINKS," or any representation, depiction, or photo of the Harbour Town lighthouse or a confusingly similar replica of the Harbour Town lighthouse.

(3) Defendant and all persons in active concert or participation with defendant are permanently enjoined from offering in connection with Defendant's golf course services a replica, copy, or imitation of the trade dress of Harbour Town Golf Links Hole 18, including the Harbour Town lighthouse. The parties are ordered to attempt to reach an agreement regarding the necessary corrective action to be taken in order to alter Tour 18's replicas of Harbour Town Hole 18 and their replica lighthouses such that they are no longer confusingly similar to the trade dress offered at Harbour Town Hole 18. Any corrective action must include, but not be limited to, removal or substantial alteration of Defendant's replicas of the Harbour Town lighthouse. Should the parties be unable to reach a settlement on corrective action within sixty days of the entry of final judgment, the Court shall enter an order imposing appropriate alterations.

(3) Defendant and all persons in active concert or participation with defendant are permanently enjoined from using in connection with the promotion, advertising, or sale

of golfing services, the service marks "PEB-BLE BEACH," "PEBBLE BEACH GOLF LINKS," "PINEHURST," or "PINE-HURST No. 2," except that defendant may use these marks only to the limited extent necessary to inform the public which golf holes it copied. To comply with this section of the injunction, Tour 18 may use plaintiffs' marks on its scorecard, yardage guide, and tee box signs. Additionally, Tour 18 may place these service marks in other printed materials only within a simple legend of the course's replicated golf holes. This legend shall include only the Tour 18 hole number, name of replicated hole, par, and yardage, similar to the legend contained within Tour 18's current promotional brochure, specifically plaintiff's exhibit 103. Tour 18 must remove all other superfluous uses of the marks listed in this section from its written materials, including but not limited to, the Tour 18 promotional brochures, mailers, advertisements in independent publications, and restaurant menu.

(4) Defendant shall place a disclaimer prominently and in bold lettering on the front of all advertisements, promotional brochures, scorecards, yardage guides, or other written materials provided to the public as a means of marketing Tour 18. The disclaimer shall disclaim any association, affiliation, sponsorship, or permission from the owners of the golf holes Tour 18 copied. Tour 18 shall maintain use of the disclaimers that currently appear on its tee box signs.

(5) Tour 18 is enjoined from using any advertisement or promotional statement claiming it used "original" blueprints, maps, or other data to construct its replica golf holes, except that Tour 18 may use such a statement if it also includes a disclaimer clearly stating that it neither received the blueprints or maps from the owners of the original golf holes or that the owners of the original golf holes authorized Tour 18's use of such blueprints or maps.

(6) Tour 18 shall have sixty days from the entry of final judgment to comply with the provisions of this injunction.

(7) All additional relief requested by plaintiffs and defendant in this cause of action not specifically granted herein is denied.

## APPENDIX

Tour 18 Promotional Brochure

**Lighthouse at Harbour Town Golf Links
Hilton Head, South Carolina**

---

### AMENDED ORDER AND
### FINAL JUDGMENT

Pending before the Court are the Motion to Amend the Findings of Fact and the Mo-tion to Amend the Final Judgment, both filed by defendant Tour 18.

In its Motion to Amend the Findings of Fact, Tour 18 requests that the Court ex-

clude references to Sea Pines' trademark registrations of the lighthouse for soft goods, real estate services, and resort hotel services. Since these registrations were not offered into evidence in the present litigation, the Court grants Tour 18's motion to amend the Findings of Fact to exclude any reference to the registrations.

In the Court's final judgment issued on September 10, 1996, the Court ordered that Tour 18 take corrective action to remedy its infringement of the trade dress of Harbour Town Hole 18, including the Harbour Town lighthouse. The Court further ordered that "should the parties be unable to reach a settlement on corrective action within sixty days of the entry of final judgment, the Court shall enter an order imposing appropriate alterations." On October 25, 1996, the Court held a hearing to determine whether the parties had reached an agreement on remedial actions. According to the arguments of counsel at the October 25 hearing, the parties have failed to reach an agreement regarding alterations to Tour 18's replicas of Harbour Town Hole 18, including the lighthouse. Therefore, the Court enters this order imposing appropriate alterations.

■ Where the Court finds that a defendant's copying of another's trade dress constitutes trade dress infringement under the Lanham Act, the Court may, in its discretion, order that the offending trade dress be structurally altered. *See Taco Cabana v. Two Pesos, Inc.*, 932 F.2d 1113, 1126, *aff'd*, 505 U.S. 763 (1992) (court ordered structural changes to restaurant design to remedy Lanham Act trade dress violation). In affirming the district court's injunctive relief in *Taco Cabana*, the Fifth Circuit stated that "[i]n fashioning relief against a party who has transgressed the governing legal standards, a court of equity is free to proscribe activities that, standing alone, would have been unassailable." *Id., citing Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 390 (5th Cir.1977). This court, in its Findings of Fact and Conclusions of Law, found that Tour 18's use of replicas of the Tour 18 lighthouse on its golf courses infringed Sea Pines' trade dress rights in the lighthouse. Therefore, as the parties are unable to reach an agreement regarding changes in the Tour 18 replica golf hole, the Court here-by orders that Tour 18's replicas of the Harbour Town lighthouse be removed from the Tour 18 golf courses.

Plaintiffs contend that alterations should also be made to the playable surface of Tour 18's replicas of Harbour Town Hole 18. Specifically, they seek an order from this Court requiring Tour 18 to change the location of the tee boxes, peninsula landing area, and frontal bunker on Tour 18's replica hole. In making its determination that Tour 18's replica hole infringed Harbour Town's trade dress, the Court found that the Harbour Town lighthouse was the distinctive, identifying feature that qualified the hole for Lanham Act trade dress protection. The distinctiveness of the lighthouse is a result of both its aesthetic qualities—its bright red and white striping, as well as its functional aspects—its use as a target for golfers to line up their tee shots. The evidence at trial conclusively showed that Harbour Town Hole 18 is famous because of the lighthouse and use as a target for golfers. The Court finds here that alterations to the surfaces of Tour 18's replicas of Harbour Town Hole 18 are not necessary to quell the confusion generated by Tour 18's replication of the hole. Once the lighthouses are removed, Tour 18's replica holes will lose the distinctive identifying feature that golfers so readily associate with Harbour Town Hole 18. Therefore, Sea Pines' request that the Court order Tour 18 to alter the playable surfaces of its golf holes is denied.

Tour 18 contends that even if the Court orders it to remove its replica lighthouses, it should be permitted to continue using the service mark HARBOUR TOWN to designate its replica holes in comparative advertising. In its Findings of Fact and Conclusions of Law, this Court discussed at length the circumstances under which a party may use another's service mark descriptively in comparative advertising. Indeed the Court entered strict guidelines for Tour 18's future use of the marks PEBBLE BEACH and PINEHURST in its advertising and promotional materials. Tour 18 contends that rather than enjoin all uses of the mark HARBOUR TOWN, the Court should impose the same restrictions as were imposed on its use of the marks PEBBLE BEACH and PINEHURST. In the Findings of Fact and Conclusions of Law, the Court entered a Final Judgment requiring that the parties consult

regarding proposed remedies for Tour 18's infringement of Sea Pines' trade dress, with specific emphasis on altering and/or removing the lighthouse. The Final Judgment reflected the Court's finding, supported by the evidence, that the lighthouse is so intertwined with Harbour Town Hole 18 in golfer's minds that they constitute a single overall trade dress. Consistent with that view, the Court finds here that once the lighthouses are removed, the remaining golf holes will no longer constitute accurate representations, either aesthetically or functionally, of Harbour Town Hole 18. Without the replica lighthouses, it would be inaccurate and unlawful for Tour 18 to continue to advertise to the public that its golf holes are replicas of Harbour Town Hole 18. Therefore, Tour 18's request that it be permitted to use Sea Pines' service mark HARBOUR TOWN to advertise or otherwise promote its golf holes is denied. Therefore, based on the foregoing the Court

ORDERS that the Motion to Amend the Findings of Fact is GRANTED: all references to Sea Pines' trademark registrations for the lighthouse for soft goods are hereby stricken. The Court further ORDERS that the Motion to Amend the Final Judgment is GRANTED IN PART AND DENIED IN PART. The Court amends and reissues the Final Judgment as follows:

(1) Defendant and all persons in active concert or participation with defendant are permanently enjoined from using in connection with the promotion, advertising, or sale of golfing services, the service marks "HARBOUR TOWN," "HARBOUR TOWN GOLF LINKS," or any depiction or photo of the Harbour Town lighthouse.

(2) Defendant and all persons in active concert or participation with defendant are permanently enjoined from offering in connection with defendant's golf course services a replica, copy, or imitation of the Harbour Town lighthouse. Tour 18 is ordered to remove its replicas of the Harbour Town lighthouse from all Tour 18 golf courses. However, Tour 18 is not required to alter the playable surface of the golf holes in question.

(3) Defendant and all persons in active concert or participation with defendant are permanently enjoined from using in connection with the promotion, advertising, or sale of golfing services, the service marks "PEBBLE BEACH," "PEBBLE BEACH GOLF LINKS," "PINEHURST," or "PINEHURST No. 2," except that defendant may use these marks only to the limited extent necessary to inform the public which golf holes it copied. To comply with this section of the injunction, Tour 18 may use plaintiffs' marks on its scorecard, yardage guide, and tee box signs. Additionally, Tour 18 may place these service marks in other printed materials only within a simple legend of the course's replicated golf holes. This legend shall include only the Tour 18 hole number, name of replicated hole, par, and yardage, similar to the legend contained within Tour 18's current promotional brochure, specifically plaintiff's exhibit 103. Tour 18 must remove all other superfluous uses of the marks listed in this section from its written materials, including but not limited to, the Tour 18 promotional brochures, mailers, advertisements in independent publications, and restaurant menu.

(4) Defendant shall place a disclaimer prominently and in bold lettering on the front of all advertisements, promotional brochures, scorecards, yardage guides, or other written materials provided to the public as a means of marketing Tour 18. The disclaimer shall disclaim any association, affiliation, sponsorship, or permission from the owners of the golf holes Tour 18 copied. Tour 18 shall maintain use of the disclaimers that currently appear on its tee box signs.

(5) Defendant is enjoined from using any advertisement or promotional statement claiming it used "original" blueprints, maps, or other data to construct its replica golf holes, except that defendant may use such a statement if it also includes a disclaimer clearly stating that it neither received the blueprints or maps from the owners of the original golf holes or that the owners of the original golf holes authorized Tour 18's use of such blueprints or maps.

(6) Defendant shall have thirty days from the entry of final judgment to comply with the provisions of this injunction.

(7) All additional relief requested by plaintiffs and defendant not specifically granted herein is denied.